# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 99-CV-8163 (JFB) (MDG)
_____

HOPE C. STUART,

Plaintiff,

VERSUS

DIRK KEMPTHORNE, SECRETARY OF THE DEPARTMENT OF THE INTERIOR,

Defendant.

_____

Memorandum and Order
July 13, 2007
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Hope Stuart ("Stuart") brought this action against defendant Dirk Kempthorne, Secretary of the Department of the Interior, alleging that she was subjected to a hostile work environment, in violation of Title VII, 42 U.S.C. §§ 2000 *et seq.*, while employed as a United States Park Police Officer. Trial in this action commenced on May 21, 2007.[1] During the course of trial, defendant repeatedly sought to dismiss this action with prejudice, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, based on plaintiff's repeated failure to be prepared to commence the trial and, once the trial commenced, based on the misconduct of

plaintiff's counsel, Ruth M. Pollack. The record in this case reveals that, both prior to and during the trial in this action, Ms. Pollack repeatedly and blatantly disregarded this Court's orders – including scheduling orders, evidentiary rulings, and decisions limiting the scope of this action – and, as such, demonstrated an astounding disregard for her obligations as an attorney and an officer of the court.

The misconduct included, among other things, the following behavior (discussed more fully *infra*): (1) Ms. Pollack arrived on the first day of trial on May 16 – which was a date that was set by the Court months earlier with the full consent of Ms. Pollack – and stated that she was not willing or prepared to proceed with the trial, even though the jury pool was waiting for jury selection, and requested an adjournment; (2) after the court

---

[1] All events referenced herein occurred in the year 2007, unless otherwise noted.

postponed the trial for several days – until May 21 – to allow plaintiff and her counsel additional time to prepare for trial, Ms. Pollack again sought an adjournment of the trial on the morning of May 21, which was denied by the Court; (3) Ms. Pollack arrived late to court almost every day of trial, including May 22, 23, 24, and 30, and June 4, without justification, despite numerous warnings from the Court; (4) Ms. Pollack failed to appear entirely on May 31, due to a purported illness for which she refused to provide medical documentation despite repeated requests for such documentation by the Court; as a result, the jury (after waiting half of the day for counsel to arrive) was sent home for the day; (5) Ms. Pollack repeatedly asked for mistrials and/or postponements of the trial throughout the course of the trial so that she could engage in an investigation of an alleged obstruction of justice by the federal government and/or add additional claims or allegations to the complaint based on recent conduct by the Park Police and the United States Attorney's Office; (6) Ms. Pollack filed a new lawsuit during the trial alleging that the United States Attorney's Office and the Court were involved in an obstruction of justice, and then sought a mistrial and adjournment of the trial based on this new lawsuit, which the Court denied; (7) on several occasions, both within and outside the presence of the jury, Ms. Pollack refused to proceed with the trial in response to adverse evidentiary rulings by the Court or the Court's denial of a request for a mistrial or postponement of the trial, and then only proceeded after threatened with dismissal of the action; (8) Ms. Pollack blatantly and intentionally defied the Court's evidentiary rulings by asking questions of witnesses regarding evidence the Court had specifically precluded as irrelevant and/or prejudicial and, when asked by the Court to explain her misconduct, stated that she did not violate a "lawful" order or an order supported with a proper "legal basis"; (9) Ms. Pollack repeatedly impugned the integrity of defense counsel, including openly accusing them of criminal conduct, mocking opposing counsel, and questioning the authority of the Court both within and outside the presence of the jury; and (10) Ms. Pollack repeatedly interrupted the Court and opposing counsel when they were speaking, despite numerous warnings not to do so.

On multiple occasions, and with increasing frequency over the course of the trial, the Court warned Ms. Pollack and her client that, if Ms. Pollack's misconduct and misguided strategy were to continue, the action would be dismissed with prejudice. Furthermore, during the course of the trial, the Court twice warned plaintiff that it was going to consider the imposition of monetary sanctions against Ms. Pollack, in the hope that such measures would spur Ms. Pollack to comply with this Court's orders. Specifically, the Court told Ms. Pollack that her lateness and failure to appear at all on one trial day, as required by the Court, was sanctionable under *United States v. Seltzer*, 227 F.3d 36, 42 (2d Cir. 2000), and that the Court would fully consider such conduct and the appropriate sanction at the conclusion of the trial after giving Ms. Pollack a full opportunity to be heard. In addition, when Ms. Pollack directly violated the Court's order not to refer in the presence of the jury to certain evidence deemed inadmissible by the Court and stated that she did not view the Court's ruling as a "lawful" order, the Court found her conduct to be contemptuous and again stated that such conduct would be fully addressed at the

conclusion of the trial.[2]

However, despite these warnings and the Court's references to sanctionable conduct by Ms. Pollack, the instances of Ms. Pollack's misconduct grew more frequent and more severe as the trial progressed. That is, over the course of the trial, Ms. Pollack intensified her efforts to prompt a mistrial and to prevent the case from going to the jury by persistently refusing to proceed with the trial, by continuously questioning the Court's authority and impartiality in the presence of the jury, and by repeatedly discussing or referring to inadmissible evidence that had been excluded by the Court.

Moreover, although it appears that plaintiff's counsel was primarily responsible for choosing to engage in this strategy of obfuscation and delay, plaintiff herself was not free from blame. Plaintiff freely chose this attorney to represent her and act as her agent, and eventually stopped attending the trial proceedings even though she received specific notice that her attorney's misconduct, if it continued, would result in dismissal of this action. Specifically, on June 4, the Court directed Ms. Pollack to call plaintiff at work due to the fact that the Court was again contemplating dismissal of the action based on Ms. Pollack's increasingly contumacious behavior. Although the Court, at plaintiff's urging, agreed to give Ms. Pollack and plaintiff one final chance, the Court warned plaintiff that she needed to be present in Court if she wanted to ensure that her attorney was conducting the case in accordance with her wishes.

Nevertheless, despite that warning, on June 5, plaintiff did not appear for trial, and, in plaintiff's absence, Ms. Pollack's conduct continued to deteriorate, as discussed *infra*. As a result, on June 5, the Court determined that the cumulative effect of eight days of Ms. Pollack's severe misconduct – much of which occurred in the presence of the jury – had so severely prejudiced defendant and undermined the fairness and integrity of the proceedings that the severe sanction of dismissal was warranted. The Court based this determination on the well-settled principle that an attorney cannot be permitted to make a mockery of a judicial proceeding through such means as the bizarre strategy adopted in this case by Ms. Pollack – wherein she aimed to provoke a mistrial and, thus, avoid having the jury consider a claim which had been pending for over eight years. Instead, it is critical to the fair administration of justice and to the maintenance of public confidence in the court system that parties and their attorneys recognize that concerted efforts to thwart the orderly progress of a trial will

---

[2] The Court chose not to hold Ms. Pollack in summary contempt during the trial; rather, the Court noted Ms. Pollack's conduct and stated that it would be addressed at the conclusion of the trial with a full opportunity for Ms. Pollack to be heard. Moreover, the Court is aware that it would be inappropriate to make a contempt finding at this time, absent a formal contempt proceeding, because the necessity for "a swift response [to] stop[] the misconduct at hand and deter[] similar behavior" has passed. *See, e.g., nited States v. Marshall*, 371 F.3d 42, 45 (2d Cir. 2004); *see also E.E.O.C. v. Local 638*, 81 F.3d 1162, 1176 (2d Cir. 1996) ("A party charged with contempt of court (except where the contempt is made in court and is summarily punished) is entitled to notice and an opportunity to be heard."). Instead, in the instant opinion, the Court is concerned solely with documenting and analyzing the instances of conduct by Ms. Pollack before and during trial that warranted dismissal of this action with prejudice, and does not, at this time, address the appropriateness of a contempt sanction.

not be tolerated. The integrity of the judicial system is too important to allow litigants in civil actions to transform a trial in a court of law into a lawless street fight. In this Memorandum and Order, the Court offers a detailed summary of the misconduct of Ms. Pollack that led the Court to dismiss this action with prejudice.[3]

## I. BACKGROUND

### A. Procedural History

Plaintiff filed the complaint in this action on July 21, 2000. The underlying facts of this case are set forth in detail in two earlier opinions: (1) Judge Sandra J. Feuerstein's decision, dated August 2, 2004, granting in part and denying in part defendants' motion for summary judgment and (2) this Court's decision, dated October 19, 2006, denying plaintiffs' motion for reconsideration and granting one defendant's motion for summary judgment.[4] Accordingly, the Court presumes

the parties' familiarity with the facts of this case.

However, for the purposes of the instant motion to dismiss, the Court notes that plaintiff's Title VII claim arises from the allegedly hostile work environment to which plaintiff was subjected during her employment as a United States Park Police Officer at the Floyd Bennett Field Office in Brooklyn, New York. According to the complaint, plaintiff's hostile work environment claim relates to allegedly improper conduct that occurred at plaintiff's workplace from sometime in 1992 through February 1998 – the date when plaintiff went on "Worker's Compensation leave" from her position at the Floyd Bennet Field Office. (Compl. ¶ 17.) Between the filing of the complaint and January 28, 2007 – a period of nearly six and one-half years – plaintiff never sought leave to file an amended complaint.[5]

### B. Facts

The Court presents herein a summary of Ms. Pollack's misconduct that led this Court, ultimately, to dismiss this action with prejudice. Initially, the Court notes that the events recited below are mere excerpts from a long record of "persistent and repetitive tactics" by Ms. Pollack "which obstructed and interfered with and delayed the orderly

---

[3] The Court notes that, following dismissal of this action, Ms. Stuart submitted a letter stating that she was "no longer being represented by Ms. Pollack." (Pl.'s June 6, 2007 Ltr.) Subsequently, Ms. Pollack filed a letter in this action stating that she "intend[s] to appeal" this Court's decision. (Ms. Pollack's July 6, 2007 Ltr., at 1.)

[4] Plaintiff's complaint originally named as defendants, in addition to the Secretary of the Department of the Interior, the United States Park Police and an individual employee, David Ragusa. On November 15, 2000, plaintiff's suit was consolidated, pursuant to an order of Magistrate Judge Marilyn D. Go, with another employment discrimination suit brought by a former employee of the United States Park Police. Thereafter, pursuant to the two decisions listed above, all parties other than those listed in the instant caption, and all claims other than plaintiff's Title

VII claim against the Secretary of the Department of the Interior were dismissed.

[5] Pursuant to the discovery schedule set by Magistrate Judge Go at the initial conference, the deadline for the parties to seek to amend the pleadings in this action was February 15, 2001. Prior to that deadline, plaintiff did not seek to file an amended complaint nor did she seek an extension of the deadline.

progress of the trial and hampered [this Court] in the performance of [its] judicial duties." *In the Matter of Stanley S. Cohen*, 370 F. Supp. 1166, 1170 (S.D.N.Y. 1973). As stated more fully below, Ms. Pollack's conduct created precisely the kind of "extreme situation[]" that justified dismissal of this action under Rule 41(b). *Minnette v. Time Warner*, 997 F.2d 1023, 1027 (2d Cir. 1993) (quoting *Gibbs v. Hawaiian Eugenia Corp.*, 966 F.2d 101, 108 (2d Cir. 1992)).

1. Delays Attributable to Ms. Pollack

Ms. Pollack's unexplained absences and lack of preparation caused extensive delays in both the commencement and the progress of the trial.[6] As set forth below, the Court repeatedly warned Ms. Pollack and Ms. Stuart that such unexplained delays, if continued, would result in sanctions or, when coupled with Ms. Pollack's misconduct, in dismissal of the action.

a. Requests for Adjournments of Previous Trial Dates

Following reassignment of this action to the undersigned, the Court set four trial dates in this action prior to May 21. All four of those dates were adjourned, at least in part, on the basis of Ms. Pollack's requests for adjournments and/or her outright refusal to proceed on the scheduled date.

First, at a pre-trial conference on April 19, 2006, the Court directed that trial would commence on July 31, 2006. (*See* Dkt. Entry

# 73.) However, that date was adjourned at the request of both plaintiff, who wished to file a belated motion for reconsideration of Judge Feuerstein's August 2, 2004 order granting summary judgment as against another plaintiff, and defendant David Ragusa, who sought to move for summary judgment as against plaintiff's Title VII claim on the ground that there is no individual liability under Title VII. (*See* July 27, 2006 Order.)

The Court then scheduled a second trial date of October 16, 2006. (*See* July 27, 2006 Order.) By letter dated August 13, 2006, Ms. Pollack stated that "I can report that I have no scheduling conflicts with the Court's trial date of October 16, 2006." (Pl.'s Aug. 13, 2006 Ltr.) However, subsequently, on September 25, 2006, defendant submitted a letter indicating that, during a pre-trial conference in a separate lawsuit in this district, Ms. Pollack requested a trial date of October 10, 2006 or October 16, 2006 – dates which would, of course, conflict with the trial date previously set in this action. (Dft.'s Sept. 25, 2006 Ltr.; *see Dolise v. Potter, et al.*, No. 03 Civ. 6382 (ADS), Pl.'s Sept. 21, 2006 Ltr.) As such, defendant requested a status conference to "avoid an unnecessary last minute re-scheduling of witnesses and an adjournment of the trial date." (Dft.'s Sept. 25, 2006 Ltr.)

Accordingly, the Court directed counsel for all parties to appear for a conference on September 28, 2006. (Sept. 25, 2006 Order.) However, on September 28, 2006, Ms. Pollack failed to appear in-person for the conference – without previously providing notice to the Court – and, thus, participated by telephone. (Dkt. Entry # 120.) During the conference, Ms. Pollack repeatedly requested an adjournment of the October16 trial date

---

[6] In its Memorandum and Order dated October 19, 2006, the Court set forth some of Ms. Pollack's previous failures to abide by deadlines imposed by the Court in this action. *See* Oct. 19, 2006 Mem. and Order, at 2-5.

due to scheduling conflicts. The Court denied her request at that time.

Subsequently, however, Ms. Pollack renewed her request for an adjournment on the ground that one of plaintiff's prospective witnesses did not know of the October 16 trial date and, as such, had already planned a vacation that conflicted with that trial date. (*See* Oct. 11, 2006 Tr., at 2-4.) The Court noted that it was "not going to make the witness miss his vacation" nor would it require Ms. Pollack to conduct a "video deposition" of the witness prior to his trip. (*Id.* at 2-3.) Accordingly, because Ms. Pollack indicated that she "can't go [to trial] without the witness" in question, the Court adjourned the trial (*id.* at 6) and, at a later conference, set a third trial date of February 5, 2007. (Dkt. Entry # 128.)

By letter submitted eight days prior to the February 5 trial date, Ms. Pollack requested an adjournment of the trial date on the ground that Ms. Stuart's employer had not yet informed her when she would be receiving training. (Pl.'s Jan. 28, 2007 Ltr.) Furthermore, according to Ms. Pollack's letter, the "disruption of [Ms. Stuart's] life and [Ms. Pollack's] ability to schedule and prepare [Ms. Stuart] for trial" required this Court to adjourn the trial. (*Id.*) Thereafter, because Ms. Pollack also indicated in her letter that her client was willing to settle the case, the Court referred the parties to a settlement conference before the magistrate judge. Following the parties' unsuccessful attempt to settle the case, the Court adjourned the trial without a further date on January 31. (Dkt. Entry # 137.)

### b. Ms. Pollack's Consent to the May 15 Trial Date

On February 21, Ms. Pollack submitted a letter, wherein she noted that "plaintiff is prepared to select a trial date by Mid-April." (Pl.'s Feb. 21, 2007 Ltr.) Thereafter, the Court participated in a telephone conference with counsel for all parties on March 15. The Court stated the purpose of the conference: "I want to see if we can set a date today . . . because my calendar is quickly filling up. And I'm sure counsel's calendar is quickly filling up as well." (March 15 Tr. at 3.) The Court proposed that the parties pick a date in May; Ms. Pollack indicated that she would be traveling from the "7th through the 13th" of May, "but other than that I'm okay." (*Id.* at 4.) The Court then suggested that the parties "pick the jury on the 14th [of May] and start [the trial] on the 15th." (*Id.* at 6.) Ms. Pollack asked if "we [could] start on the 15th instead though, so I can just get back into my routine from this lengthy trip?" (*Id.* at 6.) Finally, the following exchange took place:

> MS. POLLACK: We would pick a jury on the 15th and then commence the following day?
>
> THE COURT: No, if we start on the 15th, we'll – you know it usually only takes me about three hours to pick a jury, so we would go right into the case that day.
>
> MS. POLLACK: Oh, going; okay.
>
> THE COURT: Okay?
>
> MS. POLLACK: Pick and go, sure.
>
> THE COURT: Okay, so let me see what I can do, and as I said, I'll issue

something in the next couple of days. If for some reason that date doesn't work, then I'll obviously have another call and we'll try to come up with another date.

(*Id.* at 6-7.)

On March 28, the Court issued an order setting a fourth trial date, directing "that trial in this action shall commence on Tuesday, May 15, 2007, at 9:30 a.m." (Order dated March 28, 2007.)[7]

### b. Ms. Pollack's May 4, 2007 Request for an Adjournment

At the final pre-trial conference on May 4, the parties agreed to engage in a settlement conference before the magistrate judge. The Court also stated at that time: "I want to make abundantly clear that should those [settlement] discussions break down, this case is going to happen; this case is going to go to trial on that date [May 15], and you [Ms. Pollack] know . . . we're going to have the trial on May 15." (May 4 Tr. at 16:13-18.).

Ms. Pollack then requested that the trial be rescheduled because she was "trying very hard to juggle my cases this month." (*Id.* at 16:19-23.) The Court denied Ms. Pollack's request, and reaffirmed that jury selection and trial in this action would commence on May 15, at 9:30 a.m. (*Id.* at 17.)

### c. Ms. Pollack's May 13 Request for an Adjournment

On Sunday, May 13, at 8:50 p.m., less than two days prior to the May 15 trial date, Ms. Pollack filed a "Motion to Stay Trial due to Extraordinary Circumstances" on behalf of plaintiff. (*See* Dkt. Entry # 145.) Ms. Pollack asserted that a stay was required to "sort[] out and investigate[]" an order issued by Magistrate Judge William D. Wall in a completely unrelated lawsuit, wherein Judge Wall imposed monetary sanctions on Ms. Pollack. (Pl.'s Mot. to Stay ¶¶ 2-3.) Furthermore, in the motion to stay, Ms. Pollack asserted that an Assistant United States Attorney ("AUSA") representing the defendant in this case, "conducted an unauthorized, covert investigation" of plaintiff when the AUSA contacted employees of the Department of the Interior to inquire about issues related to plaintiff's Workers' Compensation claims. (*Id.* at 4-5.) Finally, Ms. Pollack stated that "I have never requested an adjourn [sic] date of this trial before this."[8] (*Id.* at ¶ 14.) On May 14, the Court issued an order denying plaintiff's request for a stay, and directing the parties to appear for trial on May 15 at 9:30 a.m. (Order dated May 14, 2007.)

---

[8] This statement is directly contradicted by the very document in which it is contained, as well as by the record of the proceedings in this case. First, in paragraph two of the motion to stay, Ms. Pollack states that, at the pre-trial conference on May 4, "I respectfully requested that a [trial] date in June be agreed to between the parties. . . . The Court declined to permit my request." (*Id.* at ¶ 2.) Second, previously, on January 28, Ms. Pollack submitted a document labeled as a "Letter of Status, Seeking Court Intervention and *Requesting Adjournment* of Trial Date." (*See* Dkt. Entry # 134 (emphasis added).)

---

[7] The text of the order was modified the following day to correct an erroneous date entry.

#### d. Ms. Pollack's Unexplained or Unjustified Absences During Trial

#### i. May 15, 2007

On May 15, Ms. Pollack failed to appear in the courtroom at 9:30. When Ms. Pollack did appear, at approximately 10:00 a.m., she stated that she was unable to appear on time due to an "arbitration that went late into the [previous] night," and indicated that her client, Ms. Stuart, would not be coming to the court. (May 15 Tr. at 2:19.) The Court then indicated that her most recent request for an adjournment, submitted on the Sunday night preceding trial, was not "acceptable" at a time so close to the commencement of trial, absent any extraordinary circumstances. (*Id.* at 3:12.) Ms. Pollack responded that she "did not agree to this date."[9] (*Id.* at 3:16-17.)

Next, Ms. Pollack proceeded to raise a number of issues – as discussed *infra*, relating to Ms. Pollack's other cases, Judge Wall's order imposing sanctions against Ms. Pollack, plaintiff's alleged status as a "whistle blower," and alleged misconduct by defense counsel – and stated that, until these issues were resolved, she was "just extremely uncomfortable" and "can't go forward." (*Id.* at 6:20-21.) Moreover, Ms. Pollack indicated that she viewed the May 15 trial date as a conditional date that "might be possible," and that the parties "were going to be meeting . . . to discuss the date again." (*Id.* at 3:18-22.)

After addressing the issues raised by Ms. Pollack, the Court indicated that the May 15 trial date "was not a conditional date; it was

not a maybe date. . . . So to the extent you interpreted this as a conditional date with which you could schedule other things, this is simply inconsistent with the record in this case, and it does not warrant an adjournment of the trial date." (*Id.* at 14:5-21.) In fact, the record indicates that the Court had repeatedly informed Ms. Pollack of the May 15 trial date, and, more importantly, that Ms. Pollack herself had relayed to the Court her awareness of and, at times, her consent to commencing trial on that date: (1) on March 15, upon Ms. Pollack's suggestion that "we start on the 15th," the Court indicated that it was going to set the May 15 trial date after rescheduling certain other matters (March 15 Tr. at 6), (2) on March 28, the Court issued an order directing all parties to appear for trial on May 15 (Order dated March 28, 2007), (3) on May 4, during the final pre-trial conference, the Court denied Ms. Pollack's request for an adjournment and, once again, directed the parties to appear for trial on May 15 (May 4 Tr. at 16:13-18), (4) on May 14, Ms. Pollack submitted a letter "Seeking Court Intervention and Requesting Adjournment of Trial Date" (Dkt. Entry # 134), wherein Ms. Pollack made "a request for adjournment of the above case, which the Court stated would proceed to trial on May 15" (Pl.'s Mot. to Stay, at 1), and (5) in its order denying that request, issued one day prior to the scheduled trial date, the Court again directed all parties to appear for trial on May 15 at 9:30 a.m. (Order dated May 14, 2007).

Notwithstanding these facts, Ms. Pollack continued to insist that the Court and the parties had believed that the May 15 trial date was subject to change based on Ms. Pollack's own scheduling problems, directly contravening the record in this case as well as the Court's direction to Ms. Pollack to stop raising the issue. (*See, e.g.,* May 15 Tr. at

---

[9] Her statement is directly contradicted by the transcript of the proceedings on March 15, wherein, as discussed *supra*, Ms. Pollack, in fact, clearly agreed to the May 15 trial date.

38:23-25 ("On March 15th, none of us knew where we would be in May, including the Court, knew what our schedule would be."); *see also id.* at 61:7-10 ("[N]o one seems to care that I'm asking for a short adjournment to start the trial because of the schedule I've had this month.").)

Following the Court's initial denial of Ms. Pollack's request for an adjournment on May 15, Ms. Pollack refused to proceed with the trial:

> THE COURT: I'm simply not going to adjourn this [trial] date . . . .
>
> MS. POLLACK: Your Honor, I can't proceed like this. . . . This is a democracy. We all have to work together.

(May 15 Tr. at 19:9, 20-21, 20:6-7.) The Court then directed Ms. Pollack to initiate a telephone conference between the Court and her client, Ms. Stuart. Subsequently, while on the telephone, Ms. Stuart stated that she wished to be present during trial, but explained that her absence was due to the same issues – regarding alleged retaliation in her current position, and allegedly improper inquiries by the AUSA – raised by Ms. Pollack earlier that day. The following exchange then took place:

> THE COURT: [Y]ou [Ms. Stuart] are not free to simply disregard a date that a court sets for trial. If I set a case down for trial, you can't decide, well, I have other issues; I'm not going to appear for the trial. . . . Do you understand that?
>
> MS. STUART: Yes, I do, sir. I do understand that. It was my

understanding – and I don't know how this works in a court – that my attorney was trying to present all of this information so that we could possibly have, you know, like some type of resolution or, you know, something done before we started trial.

> THE COURT: I understand that. But you knew what the trial date was, correct?
>
> MS. STUART: Well, she [Ms. Pollack] did advise me of it, but she did say she was getting time to get in contact, to express all these issues and to get a postponement, yes.

(May 15 Tr. at 27 - 28:4-8). Although plaintiff then stated that Ms. Pollack never told her that the trial was actually postponed (*id.* at 28:11-12), it appeared to the Court, based on plaintiff's statements, that Ms. Pollack had failed to convey adequately to plaintiff that the May 15 trial date was, in fact, a "firm" date. As such, the Court relayed to plaintiff the multiple instances, discussed *supra*, when the Court told Ms. Pollack that the trial was certain to commence on May 15, including the Court's most recent order issued on May 14:

> THE COURT: [Y]our attorney sought an adjournment by submitting something on Sunday –
>
> MS. STUART: Yes.
>
> THE COURT: – which I denied yesterday and directed the parties to appear today [May 15] at 9:30.
> MS. STUART: I was not notified that you denied it yesterday. . . . I wasn't

9

aware.

(May 15 Tr. at 30:17-25.)  The Court then expressed to Ms. Pollack its concern that, "despite my repeated direction there would be no adjournment" of the May 15 trial date, plaintiff had somehow been given the impression that she did not need to appear for trial on that date.  (*Id.* at 31:7-16.)

Finally, following extended reargument by Ms. Pollack of the Court's ruling denying her request for an adjournment, Ms. Pollack stated that she would begin trial the following day, if requested by the Court, even though she was not prepared to do so.  However, following a brief recess to consider the issue, the Court stated:

> I'm trying to balance the fact that there is no legitimate reason for the case not to proceed today with the desire not to issue a remedy that unfairly punishes the plaintiff for that failure. . . .  And I'm also concerned, although Ms. Pollack states that she will proceed tomorrow morning, . . . that she is not in a position to proceed tomorrow morning. . . .  Balancing those various issues, I think the appropriate remedy . . . is to give Ms. Pollack a few days to get – to contact her witnesses and to get them ready to proceed with the trial.

(May 15 Tr. at 63:10-25 - 64:1-4.)  Accordingly, the Court directed the parties to appear for jury selection and trial on May 21 at 9:30 a.m.  (Dkt. Entry # 146.)

### ii. May 17, 2007

On May 17, Ms. Pollack submitted to the Court a "letter requesting relief from obstructing of US Attorney," wherein she (1) alleged "obstructing of justice" by defense counsel in providing information about former government employees too close to the time of trial, and (2) stated that the Court has not responded to the "serious concerns" raised in her May 20 letter (the Court's response thereto is discussed *supra*).  (Pl.'s May 17, 2007 Ltr.)  As a result, Ms. Pollack asserted, once again, that she "cannot proceed" with commencing trial in this action.  (*Id.*)  In an order issued later in the day on May 17, the Court denied plaintiff's renewed request for an adjournment of the trial, and scheduled a telephone conference on May 18 to address the remaining issues raised in Ms. Pollack's letter.  (Order dated May 18, 2007.)

### iii. May 22, 2007

On May 22, the second day of trial,[10] Ms. Pollack failed to appear, as ordered, at 9:30 a.m.  Instead, Ms. Pollack called the Court at 9:15, left a message indicating that she was going to be late for the trial, and arrived to the courtroom at approximately 10:25 a.m.  (*See* Tr. at 80:3-22.)  When asked to explain her lateness, Ms. Pollack stated that she had spent the morning making inquiries as to an alleged "obstruction of justice" by defendant; specifically, according to Ms. Pollack, defendant had failed to produce to plaintiff several boxes of personnel materials related to one of plaintiff's proposed witnesses, former Park Police Officer Michael Fellner (hereinafter, the "Fellner documents"), which,

---

[10] On May 21, Ms. Pollack appeared on time for jury selection, and presented her opening argument to the jury.

according to Ms. Pollack, were relevant to Ms. Stuart's Title VII claim.[11]  (Tr.[12] at 76-77.)

The Court explained to Ms. Pollack that:

It is not acceptable for you to decide I'm going to have everybody wait for an hour while I look into this [alleged obstruction of justice.]  That's not acceptable, and you know that. . . . [T]he appropriate way to handle this type of situation is to come to Court at 9:30, like everybody else, and advise me that you have a problem because of what you believe is a failure to turn over records.  And if you need time to do that, then I will grant you the time if I think it's appropriate.  You can't just show up an hour late because you think it warrants you showing up an hour late.  That's not acceptable.[13]

(Tr. at 78: 4-16.)  Ms. Pollack continued to argue that her lateness was justified – asking "Can we not agree that an obstruction of justice is more important than my being here late because I discovered the obstruction of

justice?  Is that not more important?"  (Tr. at 82: 6-9.)

iv. May 23, 2007

On May 23, Ms. Pollack failed to appear in court at 9:30 a.m., as ordered, and, instead, arrived at approximately 10:05 a.m.  (*See id.* at 296:10-11.)  Ms. Pollack sought to explain her absence by asserting, incorrectly, that there was a criminal proceeding in the courtroom prior to 10:05 a.m. and, thus, she chose not to enter the courtroom so as to avoid interrupting the proceeding.  When the Court pointed out to Ms. Pollack that there had been no proceedings in the courtroom *until* 10:05 a.m., the following exchange took place:

THE COURT: You are representing to the Court that you came into this building, you were in this building at 9:30, is that your representation to this Court?

MS. POLLACK: Not at 9:30, no.

THE COURT: What time did you arrive to this building?

MS. POLLACK: I don't believe it's necessary for me to answer that question, your honor. . . .  What is it that your Honor would like to really know that's important to this case here, your Honor?  I'm ready to go on time and the case is ready to go and I haven't missed anything and I'm present, ready to go right now, and I have been sitting outside.

THE COURT: We could have started at 9:45 if you were here, and you were not here.  Your client was here at 9:30

---

[11] As discussed in detail below, the Court later found that the issues related to the Fellner documents had already been addressed by the magistrate judge during the discovery phase of this action, and that Ms. Pollack failed to proffer any evidence demonstrating that defendant had violated a discovery order.

[12] "Tr." refers to the transcript of the proceedings at trial in this action, unless preceded by a specific date.

[13] Ms. Pollack replied, incredibly, that "I'm here to try this case.  I have been on time every single day."  (Tr. at 79:19-21.)

as directed, as she has been, and she and [the Court's] deputy did not know where you were. You were nowhere to be found.

\*\*\*

THE COURT: What time did you arrive?

MS. POLLACK: I'm not willing to be set up by anybody, as I have been during this trial. That's unfair. . . . So I was here ready to go on time today, your Honor. The Court obviously had other business. I am ready to go and I haven't missed anything.

(*See id.* at 297:7-25 - 299:1-9.) Later, the Court addressed Ms. Pollack's persistent lateness:

[I]t's the court's view that she has, again, in spite of the fact that she was warned yesterday when she arrived over or approximately an hour late, and everybody was waiting, and the fact that last week she arrived a substantial period of time late. . . . So we have had four days – well, we had the trial last week, and she was not prepared to go forward, but in terms of this trial, there have been four days. She has failed to appear timely on three of those days. The court . . . cannot tolerate the effect this [persistent lateness of Ms. Pollack] is going to have if it continues on my ability to manage this case and my calendar of other cases because of delays that the court, the jury, the parties and her client are continuing to be subjected to based upon this conduct.

(*Id.* at 408:6-22.) The Court also quoted a portion of the Second Circuit's decision in *United States v. Seltzer*, regarding a district court's inherent authority to sanction attorneys:

[W]e hold that the inherent power of the district court also includes the power to police the conduct of attorneys as officers of the court, and to sanction attorneys for conduct not inherent to client representation, such as, violations of court orders or other conduct which interferes with the court's power to manage its calendar and the courtroom without a finding of bad faith.

227 F.3d at 42. The Court then stated that, prior to imposing sanctions on Ms. Pollack, it would give her "one final warning," and would sanction Ms. Pollack "the next time that this happens." (Tr. at 409:2-25; *see also id.* at 410:6-13 ("I have given [Ms. Pollack] an opportunity to [] explain her lateness each time it has happened. I have found each time her reasons to be insufficient.").)[14]

v. May 24, 2007

On May 24, Ms. Pollack, as directed by the Court, checked in with the Court's deputy at 9:30 a.m. However, after Ms. Pollack told the Court's deputy that she was going to the restroom, Ms. Pollack did not return to the courtroom until 9:50 a.m. (*Id.* at 554:3-17.) The Court advised Ms. Pollack, as it "tell[s] everybody, including the jurors," that she

---

[14] At the end of the day on May 23, the Court specifically warned Ms. Pollack that "if you are directed to be here at a certain time, you have to report in to my deputy that you are here." (*Id.* at 412:8-10.)

needed to allow "sufficient time" for whatever activities she needed to do in the morning, "so that you can be in court on time." (*Id.*) The Court did not ask Ms. Pollack to explain her lateness, stating that it was not "chastising" her in any way, but wanted to ensure that trial would not be delayed by Ms. Pollack's lateness "every day." (*Id.* at 554:24-25.)

### vi. May 30, 2007

Ms. Pollack failed to appear for trial at all on May 30,[15] due to what Ms. Pollack asserted was an "emergency situation" relating to "problems in [her] right leg"; Ms. Stuart also chose not to attend the trial on this day.[16] (*See id.* at 1008:9-17.) Ms. Pollack relayed this information to the Court during a telephone conference it had initiated to address Ms. Pollack's absence, and to see if she would be able to return to Court later that day.[17] During the conference, the Court advised Ms. Pollack that she was required to submit "documentation" from her doctor stating the reasons for her absence, and would allow her to do so *ex parte* in order to respect her privacy. (*See id.* at 1010:4-10.)

The Court emphasized that it was "not going to prevent [Ms. Pollack] from going to the doctor, but [it was] going to require the doctor to submit . . . documentation regarding the nature of the illness [and] its impact on your ability to be here this morning . . . because that's important for this Court to have." (*Id.* at 1010:25 - 1011:1-13.) Furthermore, the Court warned Ms. Pollack that, if she failed to provide such documentation to explain her most recent absence, the Court would consider imposing sanctions on Ms. Pollack due to what would be an unexplained failure to appear for trial.[18] (*Id.* at 7-15.) Ms. Pollack, at least initially, indicated that she would ask her doctor to submit such documentation to the Court. (*See id.* at 1010:23-24; 1011:14-15; 1017:4-6.)

As the trial proceeded, however, Ms. Pollack indicated she would not comply with the Court's order requiring medical documentation:

> I need a note because it is not sufficient as an officer of the court I tell you I have problems. I find that insulting, I find that a violation of my HIPA [the Health Insurance Portability and Accountability Act of 1996] violations [sic] to provide a doctor's note.

---

[15] The previous day, May 29, Ms. Pollack had arrived on time for the commencement of trial.

[16] This was the first day of trial proceedings that Ms. Stuart chose not to attend; according to Ms. Stuart, she had exhausted her paid leave, or "comp time," from her job, and elected to go to work rather than be absent from work without pay. (*Id.* at 1008:22-24.) As of the afternoon of May 30, Ms. Pollack indicated that she had not yet informed Ms. Stuart that trial would not proceed on that day; as such, the Court urged Ms. Pollack to inform plaintiff of what had transpired that day. (*Id.* at 1030 - 1020:1-7.)

[17] Initially, Ms. Pollack indicated that she may be able to return to court later that day; however, Ms. Pollack later called back and told the Court that her doctor had advised her to "stay off [her] feet for the rest of the day," and, therefore, that Ms. Pollack would not be able to return to court that day. (*Id.* at 1016:20-24.)

[18] The Court noted, of course, that the jury would not be informed as to the reason for the delay, but would only be told by the Court's deputy that "an emergency situation has come up." (*Id.* at 1015:14-21.)

(*Id.* at 1305:6-13.) The Court responded that it was asking for such documentation based "on the entire . . . record that I have observed for myself in the course of this case, and I believe it's appropriate and I continue to direct that you provide that to me." (*Id.* at 1305:18-21.) Yet, ultimately, at the time of dismissal of this action – six days after Ms. Pollack's failure to appear for trial – Ms. Pollack had failed to provide any documentation to the Court regarding the reasons for her absence, medical or otherwise.[19]

### vii. May 31, 2007

On May 31, Ms. Pollack failed to appear in court at 9:30 a.m., as directed, and, instead, arrived at 9:46 a.m. When asked to explain her lateness, Ms. Pollack stated that she "was in the bathroom," and that she had failed to check in with the Court's deputy at 9:30 a.m. (*Id.* at 1024.) The Court noted that it viewed her lateness as an unexcused absence, and advised Ms. Pollack that her continued lateness was just one manifestation of what appeared to be an intentional plan to "get this trial adjourned." (*Id.* at 1028:1-25.)

### viii. June 4, 2007

On June 4, Ms. Pollack appeared at 9:30 a.m. Ms. Pollack then left the courtroom and did not return until approximately 10:15 a.m. (*See id.* at 1523:3-23.) Ms. Pollack indicated that she left to file a lawsuit, discussed *infra*, arising from the events in this case:

> THE COURT: [Y]ou were here somewhere around 9:30, and you left.
>
> MS. POLLACK: And I went downstairs to take care of some business that I couldn't get to earlier, sir . . . .
>
> THE COURT: I know, but you can't keep everybody waiting while you [take] care of other business. This is a trial. We have to proceed with the trial.

(*Id.* at 1523:19-25 - 1524:1.) The Court advised Ms. Pollack that "you can file any action you want, but I do not want the trial [in this action] to be delayed every morning." (*Id.* at 1525:3-4.)

### ix. June 5, 2007

On June 5, Ms. Pollack failed to appear at 9:30 a.m., did not check in with the Court's deputy, and did not arrive until approximately 9:45 a.m. (*Id.* at 1725:6-25.) Ms. Pollack refused to offer an explanation for her lateness, or even to acknowledge that she was, in fact, tardy. (*See id.* at 1725:24-25 ("I don't know what I would be explaining. . . . I've been here and I've been ready to go.").)

---

[19] On May 31, the Court directed Ms. Pollack to submit documentation by the end of the day. (*Id.* at 1025:24-25.) Ms. Pollack indicated that she had already asked her doctor to submit a letter, but that her doctor was "busy" and might take some time to deliver the letter. (*Id.* at 1026:4-7.) Ms. Pollack failed to comply with the Court's direction.

### 2. Ms. Pollack's Unprofessional Comments Toward the Court and/or Counsel

On May 15, Ms. Pollack first notified the Court that she was unprepared to commence with trial on the date – May 15 – that she had suggested. Ms. Pollack then attacked the conduct of defense counsel, asserting that, by making inquiries as to plaintiff's Workers' Compensation benefits and her personal finances, defense counsel had

> [V]iolated my client's rights under HIPAA [the Health Insurance Portability and Accountability Act of 1996], and that has to be taken up with her superiors and with the inspector general's office. [The AUSA] is not above the law. . . . [The AUSA's conduct] is so over the line of proper behavior by an attorney, much less a U.S. Attorney . . . , that I'm shocked, shocked by it. . . . So this case needs to be reassigned to somebody else who knows how to comport themself in accordance to the law.

(May 15 Tr. at 12:16-19 - 13:5-14.) Ms. Pollack failed to proffer any evidence at any point during these proceedings demonstrating that the AUSA's inquiries violated any federal law or regulation. Nevertheless, she continued to allege serious misconduct by defense counsel and threatened to, among other things, report their actions to "Congress." (*See, e.g.,* May 15 Tr. at 52:4-5; 73:10-15 ("[Defense counsel] is the latest of impediment makers."); 81:5-15; 468:4-25; 741:24-25 - 742:1-3 ("The government is hiding evidence. They're suppressing evidence."); 1889:1-2 ("This [U.S. Attorney's] office is being investigated by Congress.").) In addition, Ms. Pollack repeatedly engaged in personal attacks on the integrity of defense counsel, often within the presence of the jury, based on what this Court viewed as ordinary litigation conduct by defense counsel, such as objecting to arguably or clearly improper questions by Ms. Pollack. (*See, e.g., id.* at 1382:2-15; 1847:23-25 - 1848:1-2 (stating, within the presence of the jury, "I don't see why the US Attorney would prevent me from eliciting [a witness'] role in the investigation").)

Ms. Pollack also repeatedly insisted that the Court had refused to accommodate her schedule, while making allowances for the Court's and defense counsel's schedules. For example, following one of many instances where Ms. Pollack indicated that she was "concerned that my schedule is not ever taken into consideration" by the Court, the Court observed that it was "shocked, frankly shocked" to hear such an accusation, "because the history in this case is exactly the opposite." (May 15 Tr. at 17:17-18, 18:8-11.) The Court noted:

> I've made more accommodations, scheduling accommodations and deadline accommodations, in this case than I have in any of the other 300 civil cases on my docket. So I ha[ve] made every effort humanly possible to set a date consistent with everyone's schedules.

(*Id.* at 18:21-25.)

In addition, Ms. Pollack persistently accused the Court of favoring, or, in her words, "protecting," the defendant in this action; Ms. Pollack often coupled such accusations with requests for the Court's recusal based on its prior employment in the Department of Justice, or by suggesting that the Court's prior employment was the source

of an unfair bias against plaintiff. (*See, e.g., id.* at 622:18-25 - 623:1-13 ("And I believe what we have here is . . . not only a crime . . . but a cover-up of the crime by people who are in [a] position of authority."); 672:13-17 ("[Defense counsel] never gets admonished. . . . Nobody but me. That's not fair. That[] shows a bias, your Honor. . . . Your Honor, consistently, with all due respect, you continually defend the conduct of the U.S. Attorney's office and you continually protect them. They do not need protection. . . . I can't continue like this your[] Honor. It's unfair."); 677:9-21 ("[Y]ou actually remember something that happened to [defense counsel] yesterday almost as if he's a friend of yours. Well, who's looking out for me, your Honor, and my client? Is there anybody in this courtroom that cares about what I have to go through on a day to day basis . . . ? No one ever looks out for me."); 741:24-25 - 742:1-3 ("[Y]ou're protecting the U.S. Government."); 1881:19-20 ("[Y]ou practically argued the government's case for them.").) In response to such comments, the Court would remind Ms. Pollack that, throughout the course of the proceedings in this action, the Court had given the needs of plaintiff, and, especially, of Ms. Pollack, substantial consideration in scheduling matters, while questioning witnesses, and in every other phase of this action. (*See, e.g., id.* at 625:9-18 (THE COURT: "The trial will be conducted in a fair and impartial manner and I can assure you and your client of that once again.").) Nevertheless, Ms. Pollack continued to assail the Court with accusations of unfair bias against plaintiff and favoritism toward defendant.

Ms. Pollack also leveled personal insults against defense counsel and/or the Court on several occasions. For example, on June 5, Ms. Pollack asserted that "this court is not interested in the facts of the case. It is more interested in whether or not I go to the bathroom in 10 minutes." (*Id.* at 1858:19-22; *see also id.* at 741:22-25 ("[Y]our honor has an obligation to her as a victim of this despicable case to protect her as much as you're protecting the U.S. government. The government is hiding evidence. They're suppressing evidence."); 1875:14-19 (stating, during the Court's ruling granting defendant's motion to dismiss, "you never said you were going to have my client put on the phone so that you could dismiss her case. That is more of a hostile work environment and I think it is one of the cruelest things you could do to a litigant who is trying to get her case to the jury."); 1882:6-7 ("You have stymied me and harmed me."); 1894:11-12 ("The reason that you [the Court] want this case to be dismissed is to block a whistle-blower, Ms. Stuart . . . from getting the information about her case to a jury or to anyone else.").) The Court reiterates that the above-cited examples of Ms. Pollack's unprofessional conduct are but a small portion of a catalogue of insults, interruptions, and caustic comments directed at the Court, witnesses, and, especially, defense counsel. (*See, e.g., id.* at 743:1-25 ("They [counsel for defendant] don't seem to think that they have to abide by the same laws that everybody else does. . . . I can't go forward. . . . I'll have to sit here with my hands folded. . . . I cannot proceed without them [the Fellner documents]."); 881:24-25 - 882:1-19 ("[T]he overarching problem in this case is that the government is being permitted to suppress boxes of information that have never been made available to me."); 1382:7-25 - 1383:1-15 ("We're not in grade school and he [defense counsel] doesn't need your [the Court's] help. He's a grown man."); 1529:14-19 ("[E]very single thing that the US Attorney now does, . . . has become additional grounds for this lawsuit that I have filed

against it because they will not stop obstructing justice."); 1860:11-12 ("I just want to respond to what the US Attorney just babbled out and made absolutely no sense.").)

### 3. Ms. Pollack's Failure to Obey the Court's Rulings

Throughout the trial, Ms. Pollack flagrantly disregarded this Court's rulings, and, thus, exhibited an extraordinary disdain for this Court and the integrity of the proceedings in this action. This conduct, and the Court's admonishments thereof, often occurred in the presence of Ms. Stuart; however, to the extent that certain instances of noncompliance occurred outside the presence of Ms. Stuart, the Court, as discussed below, ensured that she was put on notice of her attorney's misconduct, and the adverse consequences that would result if such conduct were to continue.

As an initial matter, the Court notes that, as discussed *infra*, Ms. Pollack would frequently refuse to proceed with the trial whenever the Court would reject one of her requests to raise collateral issues, investigate unsupported allegations of government misconduct, or otherwise make a ruling Ms. Pollack viewed as adverse to her own position. (*See, e.g.,* May 15 Tr. at 35:4-18 ("I'm concerned that my concerns [regarding defense counsel's allegedly improper inquiries] . . . have completely been ignored. . . . I cannot, in my experience, move forward with a trial under the circumstances, without an investigation. This is serious misconduct that I'm complaining of."); 56:12-14 ("The defense team should have known who they should call and identify them to me months ago, because I do depose witnesses. I can't proceed like this."); 891:10-17 ("Until I receive the material [the Fellner documents] .

. . I can't finish this case."); 904:25 - 905:1-3 ("Your Honor, if I'm going to be limited in this respect, I'm not going to be able to proceed.").) Each such refusal to proceed resulted in a significant delay, as the Court would hear Ms. Pollack's objections and, having found them to be without merit, would order Ms. Pollack to proceed with the trial, or face sanctions and/or dismissal under Rule 41(b). As this Court observed, following one of several instances where Ms. Pollack repeatedly questioned a witness regarding matters specifically prohibited by the Court:

> [O]nce again she is doing everything she possibly can to disrupt this proceeding in a way to make it end, because that has been her goal from day one of this case, despite her client's request . . . to her that she continue this case and abide by the Court's ruling[s], which she has continually refused to do.

(Tr. at 1854, 9-16.) The Court recounts below certain rulings which Ms. Pollack repeatedly violated during the course of the trial.

### a. Evidence Relating to Michael Fellner's and John Gangemi's Disputes With the United States Park Police

Ms. Pollack intentionally violated this Court's rulings prohibiting inquiries into certain allegations of discrimination made by other male Park Police Officers. She repeatedly attempted to elicit testimony regarding such allegations within the presence of the jury, and, as is clear from the record, with the intent to trample upon the boundaries set by the Court. For example, while conducting her direct examination of former Park Police Officer Michael Fellner, Ms. Pollack asked him to describe the substance of

employment discrimination complaints he had previously filed while working as a Park Police Officer. (*Id.* at 447:20-25.) Following defendant's objection, the Court ruled:

> [Y]ou cannot bring [up] other instances . . . unrelated to the treatment of women in connection with Building D-9 [plaintiff's workplace]. If you want to question [Mr. Fellner] regarding what his responsibilities were generally with respect to such types of complaints, you can ask him that. But to ask him about all the files he had and his case or other types of cases unrelated to that topic, which is the only topic in this case, it is precluded.

(*Id.* at 450:16-25.) Ms. Pollack immediately stated, with regard to the Court's ruling:

> You are tying my hands and you are not letting the truth come out in this case, Judge, and I can't try this case.
>
> ***
>
> I don't think that's going to give me enough latitude to try my case then. We might as well just stop right now.

(*Id.* at 452:5-7, 21-22.) Thereafter, although Ms. Pollack eventually chose to proceed with the trial – after extensive argument – she consistently questioned witnesses as to areas beyond the scope of the Court's ruling on this matter.

For example, while questioning another male former Park Police Officer, John Gangemi, Ms. Pollack, once again, exceeded the limits set by the Court regarding evidence of other alleged acts of discrimination. Ms.

Pollack sought to ask questions regarding several alleged instances of harassment directed toward Mr. Gangemi during his time as a Park Police Officer, and the physical evidence offered in support of those allegations (collectively "the Gangemi evidence"). The Court found the Gangemi evidence as a whole to have "either no or little probative value," and, thus, ruled that "there will be no questions" during Mr. Gangemi's testimony with regard to any of the Gangemi evidence occurring on or after February 11, 1998.[20] (*See id.* at 1397:10-20.) While objecting – repeatedly – to the Court's ruling, Ms. Pollack made it clear that she understood the specific parameters of the Court's ruling, as demonstrated in the following exchange:

> THE COURT: My ruling is that there will be no questions regarding the locker room, the locker incident, the incident on February 11 regarding the two magazines in [Mr. Gangemi's] locker, . . . I'm precluding that and precluding any subsequent incidents beyond that date under [Rule] 403. . . . I want to make sure that you understand that I do not want any questions regarding any activities that took place from the time frame I indicated.
>
> MS. POLLACK: What time frame?
>
> THE COURT: No questions about the two magazines in [Mr. Gangemi's] locker, no questions related to any activities that took place after the time frame your client left [the workplace in question].

---

[20] The Court's ruling was set out at length on the record. (*See id.* at 1387:4-25 - 1391:1-8; 1396-1399:1-11.)

MS. POLLACK: So anything after my client left [on February 11] is not permitted, that's what I understand your ruling to say.

THE COURT: As well as the February 11 [evidence].

***

THE COURT: You understand my ruling. My ruling stands. Let's bring the jury in.

(*Id.* at 1391:3-8; 1397:10-20, 1399:9-10.)

Immediately following this exchange, in what was a particularly egregious violation by Ms. Pollack of a ruling by this Court, she asked Mr. Gangemi about the excluded evidence relating to magazines found in Mr. Gangemi's locker on February 11, 1998, within the presence of the jury and only *seconds* after the Court had specifically deemed such evidence inadmissible:

MS. POLLACK: Now you [Mr. Gangemi] were interviewed, according to the materials I have, by internal affairs on February 10 of 1998. Does that refresh your recollection as to when you were interviewed?

Mr. GANGEMI: Yes.

MS. POLLACK: Now, the day after you were interviewed by internal affairs . . . , I believe you testified that you discovered pornographic material in your locker, isn't that a fact?

DEFENSE COUNSEL: Objection.

THE COURT: Sustained.

MS. POLLACK: That was on February 11; isn't that right?

(1399:17-25 - 1400:1-4; *see also id.* at 1673-1675:1-18.) The Court then excused the jury, and addressed Ms. Pollack:

THE COURT: You did that in direct violation of my instruction to you no less than 30 seconds ago; isn't that right?

MS. POLLACK: I didn't violate any order, any lawful order.

THE COURT: Not a lawful order? So you view my order not to go into that as unlawful and, therefore, violated it, is that what you're telling me?

MS. POLLACK: No.

THE COURT: Did you not hear me, 30 seconds ago, tell you that you could not question him regarding the February 11 incident? . . . Are you going to answer that question?

MS. POLLACK: There's nothing for me to answer.

THE COURT: I find your conduct contemptuous. Contempt has just taken place in this courtroom.

MS. POLLACK: Your Honor, I'm trying to follow the rules of evidence.

THE COURT: You directly violated an order I gave you because you disagreed with it and put before that jury information that I ruled they

should not hear, and that's contemptuous conduct. There's no question about it.

(*Id.* at 1400:10-25 - 1401:1-12.) Then, following a brief recess, the Court again told Ms. Pollack that it viewed her conduct as "contemptuous," and reiterated its direction that she comply with the Court's ruling. (*Id.* at 1401:18-19.) Then, incredibly, Ms. Pollack asked the Court to clarify its ruling: "You don't want this witness to tell the jury he found material [in his locker] . . . on the 11th . . . , is that your ruling, sir?" (*Id.* at 1402:18-21.) Thereafter, throughout the remainder of the trial, Ms. Pollack engaged in similar violations of the Court's rulings limiting the questioning of witnesses regarding other alleged instances of discrimination. (*See, e.g., id.* at 772-74; 899:8-14; 917:17-19; 933:1-21; 1000:21-25; 1106:23-25; 1320:20-25 - 1321:2-4; 1610:9-25.)

b. Whistle-Blower and Retaliation Claims

Ms. Pollack repeatedly violated this Court's order prohibiting her from adding and/or discussing within the presence of the jury a so-called "whistle blower" claim or a retaliation claim in this action. The issue was raised before this Court for the first time in plaintiff's May 13 motion to stay the trial. (Pl.'s Mot. to Stay ¶ 6.) At that time, plaintiff did not request leave to add such claims to the complaint; she did, however, assert that "plaintiff is perceived as a Whistle Blower both by her employee and . . . the United States Attorneys' Office and is suffering reprisal because she filed a legitimate EEO Complaint and now a federal case." (*Id.*)

The whistle-blower issue next arose on May 15 – the scheduled date for the commencement of trial in this action. That

day, Ms. Pollack asserted that there was "a whistle-blower coverup in this case. My client is clearly a whistle-blower, suffering retaliation now, and the U.S. Attorney's Office appears to be complicit in that." (May 15 Tr. at 5:1-3.) Construing Ms. Pollack's comments as a request to amend the complaint, the Court ruled that:

> This lawsuit relates to allegations of a hostile work environment over eight years ago. There is no retaliation claim in this case, and it's not part of this lawsuit. It could be part of some other lawsuit, if you choose to file such a lawsuit . . . but it's not part of this case. Therefore, it . . . [has] nothing to do with the allegations in this case or any attempt to insert it as some type of amendment to the pleadings or to add it to this case.

(*Id.* at 7:19-25 - 8:1-9.)

Thereafter, Ms. Pollack repeatedly inserted into the proceedings her belief that plaintiff and/or Ms. Pollack herself were "whistle blowers," who were suffering retaliation for voicing their complaints. (*See, e.g., id.* at 16:21-24 - 17:1-3 ("Ms. Stuart . . . is a whistle blower as to unlawful and illegal activities of the government. . . . [T]here's a double standard here; that a woman and a whistle blower, who is a woman officer, is treated with less respect than everyone else in this case."); 1599:15-19 ("And I have no doubt in my mind that my client and I . . . are whistle blowers who the government wants to suppress, and has done everything in its power to suppress."); 1622:17-25; 1730:1-4 - 1732:1-25.) Following many of Ms. Pollack's attempts to raise the issue, the Court would reiterate, often at length, its basis for refusing to permit the issues of ongoing retaliation

and/or contemporaneous 'whistle blowing' to be raised at trial. For example, when Ms. Pollack first raised the issue (in an exchange that plaintiff heard via telephone), the Court ruled as follows:

> This case has been going on – as you know, it was filed in 1999. It is eight years old. The issue in this case is – and what the jury needs to decide in this case is whether or not you [Ms. Stuart] were subjected to a hostile work environment during that time frame that you allege [in the complaint] in the late '90s. . . . [I]t's my view, and this is a matter of my discretion, that the case that you've had pending for eight years should go forward. If there are additional claims or allegations related to conduct that has taken place over the past year, then that very well may be the subject of a separate proceeding or a separate action. But I don't think it is appropriate to stop this case, given that it is eight years old, to allow those issues or claims to be injected on the eve of this trial, and then could possibly require substantial delay in the trial of this case, including potentially additional discovery [and] additional motions.[21]

(May 15 Tr. at 36:19-25 - 38:1-1.) The substance of this ruling was reiterated *ad nauseam* throughout the trial in response to Ms. Pollack's attempts to raise the issue. (*See, e.g., id.* at 54:3-8 ("I'm not suggesting . . . that these allegations should be ignored.

---

[21] Ms. Pollack immediately responded to this ruling by requesting an adjournment of the trial: "Your Honor, I'd ask for June." (May 15 Tr. at 38:2.)

However, again, Ms. Stuart, it's my determination that these issues should not be injected into this particular lawsuit at this late stage."); 1556:13-17 ("We have discussed this I don't know how many times. You are not to question with regard to whistle blowing whether or not your client is a whistle-blower or not a whistle-blower. That is not part of this case."); 1573:10-19 (asking, on the eighth day of trial, "[y]ou're [the Court] telling me I can't go into any whistle blower activity . . . I can't even go into her [Ms. Stuart] being a whistle blower of illegal activity and suffering reprisal because of it. Is that true, I'm not allowed to go into that?") 1600:20-22 ("I have already ruled on your effort to make this a retaliation case. And I'm not going to repeat it here.").)

Notably, Ms. Pollack offered, on the ninth day of trial in this action, an account of her strategy in this action – to violate this Court's orders – and of her view that this Court's rulings were, in fact, obstructing her from doing so:

> I have repeatedly explained to your Honor that I a[m] a whistle-blower, an attorney, and with a client who is a whistle-blower. . . . I have repeatedly tried to get in front of the jury that this woman is a whistle-blower because she reported federal misconduct and suffered retaliation as a result. . . . This court has repeatedly obstructed me and acted as an arm of the United States Government, which sits here in silence because the court is basically arguing its case for it.

(Tr. at 1857, 5-21; *see also id.* at 1531:1-14; 1730-32; 1843-44:1-11.) Ms. Pollack's conduct, as evinced by her brazen account of her *plan* to violate this Court's orders, was

intended to, and, in fact, did, thwart the fair and orderly progress of this trial.

### c. The Fellner Documents

Ms. Pollack also repeatedly violated the Court's ruling as to certain allegations of discovery misconduct by defendant relating to the Fellner documents. As discussed *supra*, on May 22, Ms. Pollack first asserted that defendant had failed to produce certain materials relating to Michael Fellner, a former Park Police Supervisor at plaintiff's work site. (*See id.* at 76-77.) Specifically, Ms. Pollack asserted that defense counsel had engaged in "an obstruction of justice" by failing to produce to plaintiff the entirety of materials "relative to [Mr. Fellner's] reports and his complaints of lack of supervision and hostile work environment." (*Id.* at 76.) Ultimately, having carefully reviewed all relevant materials, including the record of the discovery phase of this case, the Court concluded with regard to the issues relating to the alleged non-disclosure of the Fellner documents that:

> [I]t's my view that these issues have all either be[en] litigated before the Magistrate Judge in connection with these actions or there are certain documents . . . which were not even raised before the Magistrate Judge when the issue first arose and certain documents were requested. Again, it's the Court's view that this issue that plaintiff's counsel has continually raised has not been demonstrated to amount to any misconduct of any kind to warrant an adjournment, further investigation or anything of that nature. And certainly as [the Fellner documents issue] relates to the trial I don't see any remedy that is necessary

for purposes of the jury's consideration of the issues in this trial.[22]

(Tr. 726:19-25 -727:2-9.)

---

[22] The Court notes that it heard extensive argument regarding this matter on several occasions throughout the course of the trial, and repeatedly inquired as to defense counsel's knowledge, if any, of the allegedly undisclosed Fellner documents. For example, the following exchange took place on May 22:

> THE COURT: Let me ask, [defense counsel], is it possible there are additional files [regarding Mr. Fellner] in the Solicitor's office?
>
> DEFENSE COUNSEL: No your honor. . . . Those files were sealed and ordered to be expunged. . . . Whatever we had, had been expunged. Whatever we maintained were the . . . documents that were provided to counsel.

(Tr. at 86: 7-22.) The Court also directed defense counsel to make inquiries "to ensure that these documents are not in the possession of anyone." (*Id.* at 88:20-24.) After several days of in-court exchanges between counsel and the Court regarding this issue, defendant submitted a letter outlining, in detail, its position as to the alleged misconduct regarding the Fellner documents. Ms. Pollack failed to submit a response to defendant's letter, or to make any other demonstration that her claims regarding the Fellner documents were anything other than unsubstantiated accusations intended to derail the proceedings in this action.

Nevertheless, despite the total absence of evidence to support her position, and the Court's repeated ruling that there was no evidence of misconduct by defendant, Ms. Pollack continued to accuse defense counsel of serious misconduct and to impugn the competence of this Court due to its failure to recognize such misconduct. Furthermore, following such statements, Ms. Pollack would frequently refuse to proceed with trying the case, only to relent after the Court would reiterate its ruling at length, over Ms. Pollack's caustic objections. (*See, e.g.,* Tr. at 87:13-16 ("[T]he government doesn't want [the Fellner documents] turned over . . . because they're afraid they will not win."); 681:18-21; 733:1-18 ("I am shocked and appalled that this Court does not recognize [the alleged nondisclosure of the Fellner documents] as being a serious violation of the law, that that is a violation of federal law, it's a violation of whistle blower law, and it's a violation of my client's rights and I can't proceed like this."); 733-23-24 ("They want to cover-up wrongdoing of their own agency and I cannot sit here . . . and permit that to happen and I will not. I cannot proceed under these circumstances."); 739:4-7 ("I have clear evidence of obstruction of justice. I cannot believe that the Court does not see that. . . . I can't proceed like this. This is improper conduct."); 741:22-25 ("[Y]our honor has an obligation to her as a victim of this despicable case to protect her as much as you're protecting the U.S. government. The government is hiding evidence. They're suppressing evidence."); 743:1-25 ("They [counsel for defendant] don't seem to think that they have to abide by the same laws that everybody else does. . . . I can't go forward. . . . I'll have to sit here with my hands folded. . . . I cannot proceed without them [the Fellner documents]."); 881:24-25 - 882:1-19 ("[T]he overarching problem in this case is that the government is being permitted to suppress boxes of information that have never been made available to me."); 891:10-15 ("Until I receive the material [the Fellner documents] . . . I can't finish this case, and that I'll make perfectly clear, until that material is turned over to me . . . , I cannot finish the case and that's holding us up and the Government knows it. It's obstruction of justice and I'm not going to stand down from that position one bit, Judge."); 909:12-13; 1000:21-25; 1515:11-14.)

Moreover, even after the Court had persisted in denying Ms. Pollack's repeated requests for an adjournment and an investigation of the alleged misconduct based on Ms. Pollack's wholly unsubstantiated allegations (*see, e.g., id.* at 919:2-4 ("I [the Court] ruled we're not adjourning the trial, continuing the trial, or allowing you to conduct an investigation as part of the trial as relates to those [the Fellner documents]."), Ms. Pollack raised the issue in front of the jury while questioning Mr. Fellner, evincing an egregious disregard for this Court's directions, repeated *ad nauseam*, regarding the relevance of the Fellner documents:

> MS. POLLACK: What in those complaints that you have in front of you – by the way, what you have in front of you is not complete, correct?

(*Id.* at 917:17-19.) Following defendant's objection, and a sidebar conference – wherein the Court admonished Ms. Pollack that "I have ruled on the issue. You need to move on to other areas" – Ms. Pollack asked three *additional* questions of Mr. Fellner that directly called for discussion of the materials that the Court had specifically determined to be beyond the scope of this action. (*See id.* at 924:8-25 ("[W]hat other items would you

expect to be in your folder [containing complaints filed by Mr. Fellner] that are not there?").) After the Court sustained defendant's objections to each such question, Ms. Pollack stated what had become, at that point in the trial, an all-too-familiar response from her following an adverse ruling while in the presence of the jury:

> MS. POLLACK: Your Honor, I cannot proceed further unless I have the right to have this witness answer questions truthfully about materials.

> THE COURT: I ruled on this already, Ms. Pollack. You know I ruled on it already. You need to move on.

> MS. POLLACK: I can't move on, Judge, not without this. I'm sorry.

(*Id.* at 924:25 - 925:1-3.) The Court then directed the jury to take a brief recess, and, after they left the room, reiterated, in detail, its ruling with regard to the Fellner documents and the basis therefor. (*See id.* at 925:22-25 - 926:1-20.) In addition, the Court warned Ms. Pollack that it was going to dismiss the case if she persisted in refusing to proceed whenever the Court issued an adverse ruling. (*Id.* at 929:1-5.)

Subsequently, after resuming questioning of Mr. Fellner – "under duress," according to Ms. Pollack (*id.* at 929:25) – Ms. Pollack again raised the Fellner documents issue, in direct violation of the Court's directions only moments earlier, both outside the presence of the jury (*see, e.g., id.* at 929:9-13 ("[Y]ou're protecting the Government. . . . I want my materials.")), and while questioning Mr. Fellner within the presence of the jury (*see id.* at 939:14-17). In fact, until this action was dismissed by the Court, Ms. Pollack continued

to raise, and re-raise, the issue, and would refuse to proceed upon the Court's refusal to stay the trial on that basis. (*See, e.g., id.* at 1000:21-25 - 1001:1-25 ("[W]hat happened to those materials that . . . that we don't have in front of us today? If there is a destruction of evidence, then I'm entitled to that.").)

The Court offered an extended analysis of the issue on June 1, in a last-ditch attempt to placate Ms. Pollack. (*See* 1502:22-25 - 1506:1-15 ("[I]t's my view there weren't any discovery violations as relates to those documents and I don't see any remedy that is necessary as relates to those documents or any prejudice to the plaintiff in connection with the Fellner documents."). However, the Court's careful exposition of its analysis of the Fellner documents issue did nothing to stem Ms. Pollack's increasingly lengthy and disruptive comments regarding the issue, which continued up until the moment of dismissal. (*See, e.g., id.* at 1506:19-25 - 1509:1-25 ("I want to make it clear I am continuing in my quest to get this information . . . and that I consider this to be a serious prejudice to my client's case. . . . I will continue without fear, although I do have fear for my safety.")[23]; 1513:12-15 ("This Court is

_____

[23] The Court notes that the above-cited passage – wherein Ms. Pollack states that "I am continuing in my quest" (*id.*) – is indicative of Ms. Pollack's repeated characterizations of this action as involving her own personal interests, as opposed to an action solely seeking relief on behalf of her client. Throughout the trial, Ms. Pollack consistently sought to depict herself as a party to this action, as demonstrated by the following exchange:

> THE COURT: I ruled that [issue is] irrelevant to the consideration of what this jury has to decide. . . . This is not an action of you [Ms. Pollack] versus the

working with the government in not letting me get my documents."); 1515:11-14 ("It's a coverup and there's no other way to put it and I will not stop until I get the material. I'll have to be killed to stop me from getting the material.").)

---

Department of Justice.

MS. POLLACK: It's become one.

THE COURT: It's not.

MS. POLLACK: I filed a complaint against the US Department of Justice.

THE COURT: [T]hey are not a defendant in this case. Maybe that will be the subject of some other lawsuit.

(*Id.* at 1236:11-25 - 1237:1-4; *see also id.* at 1858:14-18 ("I am suffering and my client is suffering."); 1527:10-22 ("I am entitled to whistle-blower protection as the attorney and my client is entitled to whistle-blower protection as the filing party [in the second suit]. So we have reached a point where we just cannot continue like this. We are being obstructed and we are being stymied, and it has a reached a point where it is no longer, it is not helpful to proceed like this.") Thus, it came as no surprise to this Court when, on June 4, Ms. Pollack filed a separate lawsuit in this district that named herself and Ms. Stuart as plaintiffs, and sought relief against, among others, the U.S. Attorney's Office and this Court arising from, *inter alia*, the respective parties' conduct in the instant trial. (*Id.* at 1525:24-25.) The day that she filed the lawsuit, Ms. Pollack requested that this action "be stayed" due to the pendency of the second suit. (*Id.* 1527:10-22.) The Court denied Ms. Pollack's request for a stay, and, to the extent that she sought the Court's recusal on the basis that the second lawsuit created a conflict of interest for this Court, denied that request as well. (*Id.*)

d. Criminal Prosecution of Ragusa

Ms. Pollack also repeatedly failed to obey the Court's specific direction not to comment upon or question witnesses regarding the U.S. Attorney's Office's decision not to prosecute Ms. Stuart's alleged harasser, former Park Police Officer David Ragusa (hereinafter, "Ragusa"). Once again, as briefly recited below, Ms. Pollack not only failed to abide by the Court's directions, but, upon being reminded of her duty to do so, would often, both within and outside the presence of the jury, refuse to proceed with the trial or offer an extended list of unsubstantiated allegations of "cover-ups," government misconduct, and the Court's complicity therein.

For example, during trial proceedings on May 24, Ms. Pollack asked a Park Police employee: "Did you ever learn why or the reason that this [alleged harassing conduct by Ragusa] was declined to be prosecuted as a criminal action?" (*Id.* at 604:16-17.) After the Court sustained defendant's objection to the question, Ms. Pollack immediately asked the same question (*id.* at 604:21-25), and, a few moments later, asked it again (*id.* at 615:13-15). The Court sustained defendant's objections to each such question, and, after Ms. Pollack requested a recess to address the issue, the Court made clear its position:

> I understand you're disturbed by this[,] that he [Ragusa] was not criminally prosecuted, and Ms. Stuart may be disturbed by this as well. I'm not minimizing it. The question is, is that relevant, is that a relevant issue in this case[?] And it's my determination that it is not. The jury in this case needs to decide whether or not the [defendant] addressed the issues . . . that relate to the allegations

regarding a hostile work environment. The U.S. Attorney's office is not a defendant in this case and the decision of whether or not to criminally prosecute is obviously something that's outside the control of these supervisors and these investigators [called as witnesses]. . . . So I'm precluding any questioning of witnesses regarding discussions with the U.S. Attorney's office as to the reasons why the U.S. Attorney's office declined prosecution in this case.[24]

(*Id.* at 620:1-25.) Immediately following the Court's ruling, Ms. Pollack argued that "the failure of the U.S. Attorney's office to bring charges . . . is official misconduct in front of the Court," and "should be investigated . . . right now"; Ms. Pollack also asserted that "what we have here is . . . a cover-up of the crime" and reminded the Court of its prior employment in Department of Justice. (*Id.* at 622-23.) The Court then reiterated its ruling, and, with regard to Ms. Pollack's comments on the Court's prior employment, stated that the Court, during its prior employment in the Southern District of New York and Washington, D.C., had no awareness of the instant case in this district and found no basis

---

[24] In addition to relevance grounds, the Court also excluded the questioning of witnesses regarding this issue under Rule 403 of the Federal Rules of Evidence, on the basis that its relevance would be "overwhelmingly outweighed by the danger of prejudice [to defendant] and the confusion of issues." (*Id.* at 620:24-25 - 621:1-15.) Furthermore, the Court informed Ms. Pollack that, "to the extent you're disturbed by this [non-prosecution of Ragusa], you have to seek other remedies," such as a request under the Freedom of Information Act. (*Id.* at 18-24.)

for recusal. (*Id.* at 624:16-25 - 625:1-18.)

Subsequently, notwithstanding the Court's ruling, Ms. Pollack posed questions to several witnesses regarding the non-prosecution of Ragusa, and, upon the preclusion of answers thereto, would seek to reargue the Court's ruling or refuse to proceed with the trial both within and outside of the presence of the jury. (*See, e.g., id.* at 772-74:1-17; 869:1-25; 1232:22-25 - 1235; 1317:17-25; 1329:11-15; 1332:16-24; 1720:2-4; 1721:10-17; 1849:23-25 - 1850:1-6 .)

e. Reargument of the Court's Rulings

As noted *supra*, Ms. Pollack continuously sought to reargue the Court's rulings, even where such rulings were made clear or addressed relatively insignificant matters. The Court recites several areas in which Ms. Pollack most frequently sought to reargue the Court's rulings.

i. Legal Bases for the Court's Rulings

Most frequently, Ms. Pollack repeatedly questioned the validity of the "legal basis" for the Court's rulings, both within and outside the presence of the jury. (*See, e.g., id.* at 1398:2023; 1405:5-6; 1528:8-23; 1722:2-6 ("[T]hat is not a legal reason. That is a nonreason. . . . I take it you are not going to give me the legal reason.").) Ms. Pollack would offer such responses to adverse rulings, even though, in each such instance, the record clearly demonstrates that the legal basis was self-evident (i.e., a question calling for hearsay) or that the Court had relayed the reasons underlying its ruling *prior to* Ms. Pollack's request. Upon Ms. Pollack's objection to the "legal basis," the Court would usually respond by offering such a basis, which, as a matter of course, Ms. Pollack

would reject out-of-hand and continue to reargue the ruling at issue. (*See, e.g., id.* at 1615:24-25 (stating, after the Court directed Ms. Pollack to comply with one of its rulings, "I'm not following illegal precedent.").)

### ii. Orders to End Argument

In addition, Ms. Pollack would consistently resist the Court's attempts to end argument on a point already decided, and to proceed with the trial. For instance, during one of Ms. Pollack's frequent attempts to reargue the Fellner documents issue, the Court reiterated its view on that issue and then stated that it wanted to proceed "because I don't want to keep the jury waiting again." (*See id.* at 740:1-5.) The following exchange ensued:

> MS. POLLACK: I don't care about the jury anymore, Judge. It doesn't matter.
>
> THE COURT: I care about the jury. . . . I care about the jury because everyday they're waiting and waiting and waiting as we go through the issues and we're repeating things that we already discussed.

(*Id.* at 740: 6-19.) Ms. Pollack repeated this type of conduct with increasing frequency as the trial progressed. (*See, e.g., id.* at 741:15-17; 744:5-11; 1255:23-25.)

### iii. Rulings on Objections to the Questioning of Witnesses

Ms. Pollack also sought to reargue the Court's rulings on objections relating to the questioning of witnesses. Ms. Pollack frequently voiced these arguments within the presence of the jury, even after the Court repeatedly and carefully directed her to request a sidebar if she wished to question such a ruling. (*See, e.g., id.* at 764:22-25 - 765:1-10; 859:11-25; 876:2-9 (advising Ms. Pollack that "it's not proper to start arguing in front of the jury"); 877:3-22.) As the Court stated late in the trial, after Ms. Pollack had argued multiple rulings on objections while in the presence of the jury:

> It is not proper for you to start arguing in front of the jury when I have sustained [an] objection. Sometimes several times. And then you continue, instead of moving on, to try to ask the question that I sustained the objection to.

(*Id.* at 1155:9-18.) Moreover, while seeking to reargue such rulings, Ms. Pollack would frequently make comments within the presence of the jury accusing defense counsel of misconduct – stating, for example, that the government was hiding evidence or that the government had prevented Ms. Stuart from attending the trial on a certain day. (*See id.* at 877:1-25 (listing such comments and advising Ms. Pollack that "I don't want these things to go by without you understanding that was not an acceptable thing to do in front of the jury"); 1039:17-21.)

### iv. Requests to Approach at Sidebar

Moreover, when the Court would direct Ms. Pollack to approach at sidebar to raise such arguments, Ms. Pollack repeatedly refused to comply with the Court's request. This conduct always occurred within the presence of the jury, and, at times, included Ms. Pollack openly questioning the soundness of the Court's decision to request a sidebar or its authority to do so. (*See id.* at 764:22-25 - 765:1-10 ("I don't really want to approach. I

would rather address it [in] open court."); 815:16-25; 831:13-25 - 832:1-19; 1131:9-15: 1549:17-20 (stating, after the Court directed counsel to approach, "Your Honor, can we not approach please?"); 1895:18-24 (stating, outside the presence of the jury, "I believe that when you have a side bar it causes, again, more obstruction of justice, it wastes time, it aggravates the jury, and it takes their time up for no reason").)

### v. Recusal

Ms. Pollack repeatedly sought to reargue the Court's denial of her request for its recusal based on the Court's prior government employment.[25]    When making such arguments, Ms. Pollack's routinely asserted that the Court's prior employment presented a conflict of interest for this Court or demonstrated its bias in favor of the government.  In responding to such requests, the Court repeatedly reiterated, at length, its finding that the circumstances of this case did not merit this Court's recusal.   For the purposes of this opinion, the Court notes that Ms. Pollack continued to raise this issue throughout the remainder of the trial as a basis for this Court's recusal, or as evidence of the

alleged "cover-up" in this action.  The Court denied each ensuing motion for recusal on this basis, and cited ample authority in support of such denials.[26]

The Court also notes that Ms. Pollack's repeated re-argument of the recusal issue presents a clear example of her misguided strategy in this trial – to repeatedly raise

---

[25] Prior to appointment tot he bench, the undersigned had worked for the Department of Justice as an Assistant United States Attorney in the Southern District of New York and a Deputy Assistant Attorney General in the Criminal Division in Washington, D.C.   During the proceedings in this action, the undersigned repeatedly emphasized to Ms. Pollack that the undersigned had not been employed by the United States Attorney's Office in this District, had absolutely no knowledge or involvement in any aspect of this case during the undersigned's government service, and had no concerns about being able to preside over the case in a fair and impartial manner.

[26] Specifically, in support of one of its rulings denying a request for its recusal by Ms. Pollack, the Court cited *United States v. Lovaglia*, 954 F.2d 811, 817 (2d Cir. 1992) (finding that recusal was not required where presiding judge had social and business dealings with a family whose business entities were the victims of the defendants' racketeering activity, where the judge's relationship with the family "ended seven or eight years prior to sentencing"); *United States v. Thompson*, 76 F.3d 442, 451 (2d Cir. 1996) (finding no error where judge declined to recuse himself on the basis of judge's prior employment as a federal prosecutor, where plaintiff had no knowledge of the investigation related to the instant case); and *United States v. Martin-Trigona*, 759 F.2d 1017, 1021 (2d Cir. 1985) (finding that judge properly denied recusal motion where plaintiff had sued judge and judge' wife).  Upon the Court's citation of those cases, Ms. Pollack first asserted that "[n]one of the cases are like the case we have at bar," then asked:

> MS. POLLACK: Did you find any cases that support my position that you should recuse yourself?
>
> THE COURT: I found zero cases.  Do you have any for your position?
>
> MS. POLLACK: I actually can tell you that these cases . . . do not apply to the unique circumstances we have before us. . . . I ask the court to consider me and my client a whistle-blower.

(*Id.* at 1863:5-25 - 1864:1-5.)

collateral issues for the sole purpose of obstructing the orderly progress of this action, regardless of the issue's merit or even her previous concession that the issue, such as the recusal issue, was, in fact, a "non-issue." (Oct. 11, 2006 Tr. at 7:6.) That is, during a telephone conference on October 11, 2006, Ms. Pollack indicated that she would not be filing a motion, prior to trial, for this Court's recusal on the basis of its prior government employment:

> THE COURT: [Y]ou called chambers yesterday and said that you were not filing the motion for recusal. Is that accurate?
>
> MS. POLLACK: That is accurate. . . . I wanted to leave a message that that's a non-issue. I don't want that even to get in our way. I just want to move ahead with you as my judge.
>
> THE COURT: Okay.
>
> MS. POLLACK: I just wanted to get this [issue of recusal] off the table.
>
> THE COURT: Okay.
>
> MS. POLLACK: No longer an issue. . . . I just wanted to let you know. That's not an issue for me anymore. I don't want to even be distracted by it. I didn't want anybody else to be either. That's a non-issue.

(*Id.* at 7-8.)

### 4. Warnings Regarding the Consequences of Ms. Pollack's Misconduct

On May 15, the original scheduled date for trial to commence in this action, the Court conducted a telephone conference with Ms. Stuart while her counsel and defense counsel were present in the courtroom. In the midst of an exchange between Ms. Pollack and the Court, wherein Ms. Pollack continued to reargue the Court's ruling that she had presented insufficient grounds for an adjournment,[27] Ms. Stuart asked if she could be heard. She then stated to the Court: "Your Honor, . . . I don't feel my attorney is prepared." (May 15 Tr. at 42:9-10.) The Court noted that it understood plaintiff's concern, and warned her that:

> There are cases out there that suggest that when parties do not comply with the Court's orders and do not proceed with the prosecution of their lawsuit, that under appropriate circumstances, the Court can dismiss that lawsuit for failure to prosecute that case.

\*\*\*

---

[27] The Court explained directly to Ms. Stuart its reasoning in denying Ms. Pollack's request for an adjournment:

> THE COURT: I think those issues [regarding contemporaneous retaliation or 'whistle blowing'], given where we're at in this case, should be kept separate from this case so that this case and the issues that you've raised in this case regarding what transpired in the '90s can go forward. Do you understand that, Ms. Stuart?
>
> THE PLAINTIFF: Yes, I do.

(May 15 Tr. at 54: 9-18.)

And obviously, Ms. Stuart, I do not want to punish you or sanction you in any way if the issues I'm concerned about are not your fault, because I don't think that would be fair to you. But there are also [S]upreme [C]ourt cases that say that parties are responsible for the attorneys. And if the attorney is not prepared to go forward, there are cases that suggest that the party can bear responsibility for that in terms of a dismissal of the action.

(*Id.* at 42: 16-23 - 43:2-24.)

Also on May 15, upon defendant's first motion to dismiss on the grounds that Ms. Pollack had failed to supply "a witness list" or a "single marked exhibit" to defendant prior to trial,[28] and for failure to prosecute (May 15 Tr. at 15:8-12), the Court, in considering the motion, warned Ms. Pollack:

The Court is analyzing this case in light of the history of this case and the numerous times this case has been adjourned, and what appears to the Court an unwillingness on your part to ever, ever have a trial in this case.

\*\*\*

I obviously understand that there are additional costs that are associated

with a delay, and obviously we had a jury come in today, and they've been sent home for the day. Again, this concerns the Court, but I think dismissal of the action is obviously a drastic remedy. . . . [U]nder the circumstances, I don't think it is appropriate at this point, although I now have Ms. Stuart on the line, and I think she fully understands the seriousness of this situation and the need for her and Ms. Pollack to be prepared to proceed with the case. And that obviously changes the situation, if they are not in a position to proceed with the case when I state that we're going forward.

(May 15 Tr. at 58:7-12; 64:25 - 65:1-14.) At the conclusion of the proceedings on May 15, the Court warned Ms. Stuart that she "need[ed] to be in contact with Ms. Pollack . . . to make sure things are proceeding. It's not only your responsibility, it's her responsibility as well." (*Id.* at 87:12-16.)

Thereafter, throughout the course of the trial, the Court issued similar warnings to both Ms. Pollack and Ms. Stuart regarding the potential consequences of Ms. Pollack's misconduct and/or lack of preparedness. For instance, following the Court's ruling, delivered at sidebar, precluding Ms. Pollack from asking certain questions regarding discrimination complaints by a former Park Police employee, Ms. Pollack refused to proceed with the case. (*See id.* at 452:5-7, 21-22.) The Court then excused the jury and the following exchange took place:

THE COURT: I have determined that that type of questioning should not occur. . . . That is the ruling of this court. Ms. Pollack indicated that she

---

[28] The Court had previously ordered Ms. Pollack, on May 4, to exchange "pre-marked exhibits" and witness lists with defense counsel prior to trial. (*See* May 4 Tr. at 24-25.) Ms. Pollack failed to comply with that order; in fact, she did not exchange such materials at any point during the trial, despite repeated requests by defendant and several orders of the Court directing her to do so.

did not believe she could follow that instruction, or that it was tying her hands in a way that she could not continue with the case. And that's when I broke it off and asked the jury to leave the room.

\*\*\*

Is there anything about my instruction you don't understand?

MS. POLLACK: Yeah, there is Judge. I don't believe your ruling.

\*\*\*

I don't believe that it's proper. I think you are tying my hands, but I'm going to do the best I can to follow it, because I think your ruling favors the cover-up . . . by this governmental agency. . . .

THE COURT: I think my direction is clear. . . . I'm listening very carefully to see whether Ms. Pollack is complying with the Court's direction regarding what the proper areas of questioning are.

(*Id.* at 458:2-25 - 460:1-3.)

As the trial progressed, and as the instances of Ms. Pollack's misconduct grew more frequent and more disruptive, the Court responded with warnings about the specific, serious consequences of such conduct, as seen in the following exchange:

MS. POLLACK: I can't proceed without the evidence I'm entitled to.

THE COURT: Ms. Stuart, your lawyer is refusing to proceed with the case. She disagrees with my ruling [regarding the Fellner documents]. . . . It is not proper to refuse to proceed with a trial. If you do that, if you decide to not proceed with the trial, I'm left with no alternative but to dismiss the case as I said when she's previously done this and continues to be my position and that's what I'm going to do.

(*Id.* at 928:17-25 - 929:1-5; *see also id.* at 1028:1-25 - 1030:1-2 ("[Y]our conduct in this case from day one has shown a complete lack of respect for the Court's time and the proper administration of this trial. And it is my view . . . that you are intentionally . . . doing everything that you can to try to get this trial adjourned and to prevent the trial from going forward.").

5. The Final Two Days of Trial Proceedings

Ms. Pollack's particularly egregious misconduct on June 4 and 5 deserves special attention, as it provides a clear understanding as to the reasons for the Court's determination that dismissal of this action with prejudice was warranted. As set forth below, Ms. Pollack's misconduct on those days was so severe and so frequent as to critically undermine the fairness and integrity of the trial. That is, on June 4 and 5, Ms. Pollack's misconduct so permeated and infected the trial proceedings that, when coupled with the misconduct that preceded that date, defendant's ability to receive a fair trial and this Court's ability to ensure an orderly proceeding, were critically undermined and, thus, the severe sanction of dismissal with prejudice was warranted.

It would be an exercise in futility for this Court to attempt to relay the intensity and frequency of the innumerable instances of Ms. Pollack's misconduct, and the prejudice to defendant arising therefrom, that occurred on these two days. Instead, the Court offers a brief outline of the alarming pattern of Ms. Pollack's misconduct on each day. In addition, the Court recites one instance on June 4 wherein the Court initiated a telephone conference with Ms. Stuart *during the trial* so as to ensure that she received notice that her attorney's increasingly disruptive behavior, if continued, would result in dismissal of this action. Nevertheless, as set forth below, following the Court's warning, Ms. Stuart failed to appear for trial.

### a. June 4

By June 4, the eighth day of trial, it became clear that Ms. Pollack was solely focused on not permitting this trial to proceed in a fair or orderly fashion, and, in fact, was doing everything within her power to derail the proceedings entirely. The day began with Ms. Pollack's failure, yet again, to appear on time for trial, as discussed *supra*. Upon her appearance in court, Ms. Pollack began to engage in more of the same conduct recounted throughout this opinion – including refusals to proceed, comments regarding evidence excluded by the Court while in the presence of the jury, and other unprofessional conduct that often resulted in prejudice to defendant – only with even greater intensity and frequency than at any earlier point in the trial.

Ms. Pollack's first act on June 4 was to request a stay of the trial pending resolution of a separate lawsuit she had just filed that morning seeking relief against, among others, the U.S. Attorney's Office and this Court. (*Id.* at 1525-1526.) Upon the Court's denial of her request for a stay, Ms. Pollack refused to proceed with prosecuting this action. (*Id.* at 1527:14-22.) She eventually relented and agreed to proceed with the trial; however, her agreement to proceed was immediately followed by an attempt to re-argue the whistle-blower issue, discussed *supra*, that had already been addressed, and rejected, by the Court numerous times. (*Id.* at 1530:24 - 1531:1-15.)

Ms. Pollack then called her first witness of the day, a former Park Police investigator. She immediately engaged in a highly prejudicial and inflammatory line of questioning. (*Id.* at 1549 - 1550.) The Court sustained defendant's objection thereto, and then Ms. Pollack, as had become routine at this point in the trial, sought to re-argue the merits of the Court's ruling within the presence of the jury, and refused to comply with the Court's order to approach at sidebar. (*Id.* at 1549:1-18.)

Thereafter, throughout the day, Ms. Pollack engaged in an unrelenting effort to raise and re-raise all of the issues discussed *supra* that had previously been ruled on by the Court, such as the whistle-blower and retaliation claims involving Ms. Pollack and her client (*id.* at 1555:23-24; 1599:5-19; 1608-1610; 1622:17-25; 1623-1624); the Fellner documents (*id.* at 1557:19-25); the recusal issue (*id.* at 1601:5-17; 1604:22-23); the Gangemi evidence (*id.* at 1575:23-24); the non-prosecution of Ragusa by the U.S. Attorney's Office (*id.* at 1549-1550; 1721:10-17); the necessity for this Court to provide specific "legal bases" for its rulings and Ms. Pollack's assertions that she need not abide by "illegal" rulings (*id.* at 1571:1-25; 1615:24-25; 1673:2-13; 1722:3-7); and Ms. Pollack's refusal to comply with the Court's request for medical documentation regarding her absence

on May 31 (*id.* at 1713:18-21). In addition, Ms. Pollack repeatedly raised these issues while in the presence of the jury (*see, e.g., id.* at 1659:6-9); notably, Ms. Pollack's comments regarding these issues while in front of the jury often included wholly unsupported assertions that defendant and/or defense counsel were obstructing justice in this action or concealing evidence of defendant's wrongdoing (*see, e.g., id.* at 1557:19-25; 1599:15-19). Furthermore, following the Court's reiteration of its rulings that these respective issues lacked merit and did not require a postponement of the trial or the declaration of a mistrial, Ms. Pollack repeatedly responded by refusing to proceed with the trial. (*See, e.g., id.* at 1615: 24-25; 1627:1-10; 1628:2-6.)

At one point, for example, Ms. Pollack asked to conduct a redirect examination of a witness, John Piccolo. Ms. Pollack then asked multiple questions calling for hearsay or regarding matters the Court had previously deemed inadmissible, such as the Gangemi evidence. (*Id.* at 1609-1610.) The Court, after sustaining several of defendant's objections to Ms. Pollack's questions, directed Ms. Pollack to stop the re-direct questioning the witness; nevertheless, Ms. Pollack continued to argue the Court's ruling within the presence of the jury – that is, until the Court excused the jury. (*Id.* at 1610:11-25 - 1611:1-7.) The Court then advised Ms. Pollack:

> Ms. Pollack, you have again violated a direct order of this court regarding not going into [Mr.] Gangemi's case and the retaliation you allege he suffered. . . . It is clear to the court exactly what you are trying to do here. You are doing everything in your power to prevent this trial from going

forward. Any possible way you can derail this trial from proceeding you are pursuing [in] an effort to stop this trial . . . , in complete disregard [] for your client's case and the decision by this jury on the merits of the case, and you are simply continuing to engage in all sorts of misconduct and violat[ing] this court's orders. . . . And I have done my best to keep this case continuing despite your conduct. . . . It is completely, completely, completely improper.

(*Id.* at 1611:13-25 - 1612:1-21.) The Court then asked the defendant to state its position, but Ms. Pollack interjected:

> What difference does it make to the government? They are complicit in this. They are complicit in this cover-up of these [] issues.

(*Id.* at 1612:22-24.) After waiting for Ms. Pollack's outburst to conclude and noting defendant's renewed motion to dismiss the case, the Court stated:

> Miss Pollack has put this court in an impossible situation where she refuses to comply with any of the court's orders and simply wants to try the case in complete disregard for the court's rulings . . . , and it has put the court in an impossible situation. . . . [I]t is infecting this trial in a way that . . . I have never encountered in my experience, nor have I seen any case law reflecting this type of behavior. But I have to consider how to proceed with this case in light of the government's application.

(*Id.* at 1616:1-15.) Following a brief recess,

the Court advised Ms. Pollack that the Supreme Court has made clear that "clients can be held responsible for their lawyer's conduct," and, thus, "dismissal of cases" may be appropriate "where the lawyer . . . fails to proceed with a case as required by the court." (*Id.* at 1617:4-15.) The Court continued:

> The government . . . is seeking a dismissal outright of the case with prejudice based upon what has transpired. . . . [However,] [t]he court will continue to try to allow that process to complete itself while warning again Ms. Pollack that she needs to follow, as an officer of the court, as an attorney, . . . needs to conduct herself . . . in a manner in which she complies with the orders and rulings of this court even if she disagrees with them.

(*Id.* at 1619:12-14 - 1620:6-13.)

Immediately following the Court's statement, Ms. Pollack requested to be heard, and proceeded to raise, once again, issues regarding "a whistle-blower claim which has been raised in my client's case," "reprisals" suffered by other Park Police officers, harassment allegedly suffered by Mr. Gangemi, and other matters previously ruled on by this Court. (*See id.* at 1622:19-25 - 1623:1-17.) The Court rejected Ms. Pollack's attempt to reargue such issues; she then refused to proceed with the trial, and asked for a mistrial. (*Id.* at 1627:1-10; 1628:1-6.) Defendant also renewed its motion to dismiss the action with prejudice on the basis of Ms. Pollack's conduct. (*Id.* at 1629:8-25 - 1630:1-7 (citing *Peart v. The City of New York*, 992 F.2d 458 (2d Cir. 1993); *Janopoulos v. Harvey L. Walner & Assoc., Ltd.*, 866 F. Supp. 1086 (N.D. Ill. 1994); and *Chira v.*

*Lockheed Aircraft Corp.*, 634 F.2d 664 (2d Cir. 1980).) The Court directed Ms. Pollack to call her client – who, as noted *supra*, did not attend the trial on this day – so that the Court may "tell her [it] is going to dismiss the case with prejudice because of your failure to proceed." (Tr. at 1630:22-25.) Once Ms. Stuart was on the telephone, the Court advised her that:

> Ms. Pollack has again several times this morning failed to obey the court's rulings and orders regarding what matters she should or should not bring before the jury's attention . . . , even though I had explicitly, as you were here on Friday heard me tell her, ordered her not to do that. . . . [Y]our lawyer advised me again, as she has done in your presence, that if I'm not going to allow her to go into these areas, then she is unable to proceed with the case. And it is my view that given her actions . . . that this action should be dismissed with prejudice. But I wanted you to be advised of that and I wanted to give you an opportunity to be heard to make sure you understood what your lawyer's position is.

(*Id.* at 1632:7-25 - 1633:1-6.) Ms. Stuart indicated that she did not "want my case dismissed," and that she was "not agreeing to any dismissal." (*Id.* at 1633:7-8; 1634:1.) She then addressed Ms. Pollack:

> MS. STUART: Go forward with the case the way he's [the Court] ordering you to go forward.
>
> MS. POLLACK: That's what I'm doing.

MS. STUART: Okay? Do what he says.

MS. POLLACK: That's exactly what I'm doing.

MS. STUART: He is the judge and you are to follow his orders.

(*Id.* at 1634:11-19.) The following exchange then took place between the Court and Ms. Stuart:

> THE COURT: [A]s I have told you previously . . . , my intent from day one was to proceed with this case. . . . But your counsel, if she continues, as she has been, to disobey my orders, I'm left with no choice. I cannot proceed with a trial where your attorney is ignoring my orders.
>
> ***
>
> THE COURT: Do you understand Ms. Stuart?
>
> MS. STUART: Yes. I am instructing my attorney to follow your orders. . . . And I'm not there and I can't give her – I'm telling her to follow the rule of the court. And whatever your orders are in, that's for her to follow them.

(*Id.* at 1636:2-18; 1638:5-8.) A few moments later, the Court told Ms. Stuart:

> THE COURT: I'm warning you again [in] terms of your presence or nonpresence. . . . [Y]ou don't have to be present for this trial . . . and I know you are not here so I'm just again warning you, it is up to you whether you want to be here or not but in terms of your wanting to have input into your lawyer's decisions as the trial progresses during the day, that although I took the time again and called you [] today, I'm not going to be able to do that again. And I just want you to understand that for purpose of proceeding tomorrow. Do you understand that?
>
> MS. STUART: Yes, I do.

(*Id.* at 1639:18-25 - 1640:1-7.) Nevertheless, despite this Court's clear warnings that (1) the trial would not proceed if Ms. Pollack's misconduct continued, and (2) that, if Ms. Stuart did not appear for trial, the Court would not contact Ms. Stuart again regarding her attorney's misguided strategy in this case and her failure to comply with the Court's orders, Ms. Stuart failed to appear for trial the following day. As such, Ms. Stuart did not have the opportunity to monitor her attorney's strategy or compliance with the Court's orders.

### b. June 5

On June 5, the frequency and severity of Ms. Pollack's misconduct escalated to an even more untenable level, evincing an unprecedented disregard by Ms. Pollack for the Court's rulings and its efforts to ensure the fair and orderly progress of the trial. It was clear to the Court that such conduct, when coupled with the countless instances of misconduct that had occurred prior to June 5, had critically undermined defendant's ability to obtain a fair trial, and, thus, that dismissal of this action with prejudice was warranted.

The day began with another late appearance by Ms. Pollack for the start of the trial. This time, she did not even attempt to offer an explanation for her lateness, but rather launched immediately into an extended attack on the Court's ruling regarding the whistle-blower/retaliation issue. (*Id.* at 1726-32.) Ms. Pollack's re-argument was particularly caustic – she asserted, once again, that she need not follow such an "illegal order," and that the Court's ruling was itself an act of retaliation against plaintiff. (*Id.* at 1732:24-25; 1733:8-15.)

Subsequently, Ms. Pollack, as on the previous day, engaged in a relentless effort to frustrate the orderly and fair progress of this trial. The next several hours of the trial were filled with instances of egregious misconduct by Ms. Pollack while in the presence of the jury, including extended reargument of the various evidentiary issues discussed *supra* (*id.* at 1759:7-20; 1760:6-25; 1762:14-15; 1772:6-14; 1842:3-25; 1849:23-25 - 1850:1-6; 1851:16-21; 1864:2-5); refusals to proceed following adverse rulings (*id.* at 1781:14-20; 1782:13-14); criticisms of adverse rulings as "illegal order[s]" (*id.* at 1732:24-25; 1789:13-15); direct violations of the Court's rulings regarding the questioning of witnesses, and reargument of such rulings (*id.* at 1798:18-25; 1800:3-4; 1828:21-22 - 1829:2-25; 1832:15-23; 1847:23 - 1848:1-25; 1859:21-24); and assertions that defense counsel was withholding evidence, or engaging in other misconduct (*id.* at 1847-1848; 1860:11-18).

The following exchange demonstrates Ms. Pollack's unflagging efforts, even on the ninth day of trial, to reargue a ruling – denying plaintiff's request to present evidence regarding a whistle-blower claim – that was made clear even prior to the commencement of the trial:

MS. POLLACK: What is being precluded, your Honor? I don't know what's being precluded.

THE COURT: I do not want you to question witnesses regarding whether your client is a whistle-blower, whether she has been retaliated against–

MS. POLLACK: You don't see her as a whistle-blower then?

THE COURT: That is my ruling.

MS. POLLACK: Is that true?

THE COURT (to the Court's deputy): Bring in the jury.

MS. POLLACK: Then I can't follow an illegal order, judge.

(*Id.* at 1732.) Thereafter, as noted *supra*, Ms. Pollack accused the Court of "retaliating against [her]" by making an "illegal" ruling regarding the whistle-blower claim, and indicated that she would continue to disobey such purportedly "illegal" orders of the Court. (*See, e.g., id.* at 1734 - 1735.) Following defendant's renewal of its motion to dismiss, the Court advised Ms. Pollack:

If the lawyer refuses to obey my lawful orders, I have no choice but to dismiss this case with prejudice.

\*\*\*

The integrity of the court system, the public confidence in the court system requires officers of the court and all parties before the court to obey the rulings of that court.

(*Id*. at 1735:22-24 - 1736:1-14.) Notwithstanding the Court's statement, Ms. Pollack persisted in raising, and rearguing, the same issues and engaging in the same type of misconduct discussed *supra*, only with even greater frequency and intensity. (*See id.* at 1735-1739; 1762:1-14 (stating, following the Court's direction to obey an evidentiary ruling, "I will do what I have to do, Judge."); 1772:6-14; 1779:16-22 (THE COURT: "I have ruled they are inadmissible." MS. POLLACK: "But you can't rule they are inadmissible, because they are admissible."); 1782:13-14 ("You're [the Court] going to let them [defense counsel] bring them [evidence] in, or we're not going to be able to go ahead."); 1789:13-15 (stating, following the Court's request to approach following an objection by defendant, "I don't need to approach. I just want a legal basis from the US Attorney [for its objection], and then we'll know."); 1800:3-4 (stating, following the Court's ruling that a question had been asked and answered, "No, it is not. I can ask it again, Judge."); 1828:14-16 ("Judge, I need a legal explanation from this woman [referring to defense counsel]. And not you, because you don't represent her."); 1851:17-18 (asking a witness if "Ragusa could have been prosecuted criminally at that time?").)

The Court need not recite further Ms. Pollack's conduct on June 5, but notes that it clearly evinced an increased fervor on Ms. Pollack's part to stop the proceedings in this case and to prevent a jury from ever addressing the merits of her client's claim.[29]

Accordingly, after a half-day of proceeding in this manner, following Ms. Pollack's most recent refusal to proceed upon the issuance of an adverse ruling by the Court and the defendant's renewal, once again, of its motion to dismiss the case with prejudice,[30] the Court directed Ms. Pollack to call her client. Then, with Ms. Stuart on the telephone and counsel in the courtroom, the Court ruled:

> The government has made another application to dismiss this case with prejudice based upon the conduct of counsel throughout this morning. The court is granting that application for the reasons I'm about to state on the record.

(*Id.* at 1867:10-14.)

---

me . . . my rulings at every step that she [] can. . . . She has escalated [her conduct] once again so that at every turn she is going to debate and suggest that the US Attorney[']s Office is obstructing the case before the jury. . . . I have no words to describe how troubled I am by what I have seen in this court.

(*Id.* at 1854:17-25 - 1855:1-10.)

[30] In support of their motion, defendant first accurately pointed out that "Ms. Pollack just indicated that she repeatedly is going to try to get evidence of retaliation and whistle-blower [sic] in front of the jury," then continued:

> We are also concerned, your Honor, because every time we object, counsel is now putting on the record that the US Attorney[']s office is preventing this information from coming out.

(*Id.* at 1859:14-25.)

---

[29] The Court noted how severe the situation had become at the time:

> [Ms. Pollack] continues to speak over me. And in fact in front of the jury now she has decided she is going to debate with

The Court went on to set forth the basis for its ruling. Ms. Pollack repeatedly interrupted the Court's ruling, leveling insults and accusations of bias against the Court, and seeking to reargue many of the same rulings discussed *supra*. (*See id.* at 1884-1886:1-16.)

## II. DISCUSSION

Rule 41(b) authorizes a district court to "dismiss a complaint for failure to comply with a court order, treating the noncompliance as a failure to prosecute." *Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633 (1962)); *see Lucas v. Miles*, 84 F.3d 532, 534-35 (2d Cir. 1996) ("[D]ismissal [pursuant to Rule 41(b)] is a harsh remedy and is appropriate only in extreme situations."); *Wynder v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004) ("Rule [41(b)] is intended to serve as a rarely employed, but useful, tool of judicial administration available to district courts in managing their specific cases and general caseload."); *see also Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.*, 133 F.2d 187, 188 (2d Cir. 1943) (citing *Blake v. De Vilbiss Co.*, 118 F.2d 346 (6th Cir. 1941)); *Refior v. Lansing Drop Forge Co.*, 124 F.2d 440, 444 (6th Cir. 1942) ("The cited rule [41(b)] enunciates a wellsettled [sic] concept of practice that a court of equity, in the exercise of sound judicial discretion, has general authority . . . to dismiss a cause for want of diligence in prosecution or for failure to comply with a reasonable order of the court made in the exercise of a sound judicial discretion.").

A district court contemplating dismissal of a plaintiff's claim for failure to prosecute and/or to comply with a court order pursuant to Rule 41(b) must consider:

1) the duration of plaintiff's failures or non-compliance; 2) whether plaintiff had notice that such conduct would result in dismissal; 3) whether prejudice to the defendant is likely to result; 4) whether the court balanced its interest in managing its docket against plaintiff's interest in receiving an opportunity to be heard; and 5) whether the court adequately considered the efficacy of a sanction less draconian than dismissal.

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 63 (2d Cir. 2000); *see, e.g., Lucas*, 84 F.3d at 535; *Jackson v. City of New York*, 22 F.3d 71, 74-76 (2d Cir. 1994). The Court will address each factor in turn, and notes that, in deciding whether dismissal is appropriate, "[g]enerally, no one factor is dispositive." *Nita v. Conn. Dep't of Env. Prot.*, 16 F.3d 482, 485 (2d Cir. 1994); *see Peart*, 992 F.2d at 461 ("'[D]ismissal for want of prosecution is a matter committed to the discretion of the trial judge . . . , [and] the judge's undoubtedly wide latitude is conditioned by certain minimal requirements.'") (quoting *Merker v. Rice*, 649 F.2d 171, 173-74 (2d Cir. 1981)).

As an initial matter, the Court notes that, as demonstrated by the conduct outlined above, this is not a case where plaintiff's non-compliance arose from any inadvertence or excusable neglect; nor is this a case where plaintiff's non-compliance constituted a series of minor infractions, or other limited failures to abide by the Court's rulings. Instead, as set forth below, the Court finds, upon consideration of the above-cited factors, that plaintiff's counsel sought to delay this action and to openly disregard this Court's orders at every turn; that plaintiff received clear notice that her counsel's conduct, if continued,

would potentially result in dismissal; and that such conduct, in fact, warranted dismissal of this action with prejudice based on its effect on this Court's ability to manage its docket and, even more importantly, on the fairness and integrity of the trial proceedings in this action.

## A. The Duration of Plaintiff's Non-Compliance

There is no minimum period of non-compliance necessary to warrant dismissal under Rule 41(b). *See, e.g., Peart*, 992 F.2d at 461-62 (dismissal appropriate where attorney requested ten-day adjournment of trial date); *Maiorani v. Kawasaki Kisen K.K., Kobe*, 425 F.2d 1162, 1163 (2d Cir. 1970) (dismissal appropriate where attorney failed to appear for commencement of trial, and requested a two-day adjournment); *see also Jackson*, 22 F.3d at 75 ("We do not mean even to imply that one warning is *per se* insufficient to constitute notice."). Moreover, as observed by the Second Circuit in *Peart*, this factor "is not relevant" where, as here, plaintiff's counsel failed to comply with several court orders and "otherwise demonstrated a lack of respect for the court." 992 F.2d at 462 (citing *Ali v. A & G Co., Inc.*, 542 F.2d 595, 596-97 (2d Cir. 1976) (finding dismissal appropriate, despite any showing of delay, where plaintiff and plaintiff's counsel failed to appear at trial)). In any event, it is clear that the instant case presents an extreme example of extended non-compliance with a court's orders by a party.[31]

That is, Ms. Pollack's non-compliance extended throughout the course of the pre-trial phase of this case and almost constantly during the trial in this action.

As set forth above, Ms. Pollack failed at every turn of the pre-trial phase trial to comply with the Court's orders. She sought numerous adjournments of the trial date on grounds that the Court had previously rejected, and failed to be prepared to try the case on its original scheduled date, despite repeated orders by this Court directing Ms. Pollack to be ready at that time. Her lack of preparedness required this Court to delay the trial, thereby imposing significant costs upon defendant and the sixty prospective jurors who were ordered to appear at the courthouse on the original trial date, and further frustrating this Court's ability to effectively manage its docket and to move this case forward. More importantly, as discussed at length above, during the course of the trial, Ms. Pollack repeatedly violated this Court's orders, with increasing frequency as the trial progressed. Therefore, the Court finds that this factor favors dismissal.

## B. Notice

Plaintiff and her counsel indisputably received notice, both prior to the trial and repeatedly during the course of trial in this action, that Ms. Pollack's continued failure to comply with the Court's orders would result in dismissal, and each had numerous opportunities to be heard on that issue. Yet, even after plaintiff and her counsel received such notice, Ms. Pollack persisted in her errant conduct. Therefore, for the reasons set

---

[31] The Court notes that, in analyzing this factor, counsel's noncompliance is attributed to plaintiff absent an inquiry into the client's notice of or responsibility for her attorney's misconduct. *See, e.g., Drake*, 375 F.3d at 255 ("The question we must ask with respect to duration is simply whether or not the delay was caused by plaintiff's

side as a whole.").

forth below, the Court finds that this factor strongly favors dismissal, and that Ms. Stuart should not be excused from the consequences of her attorney's misconduct.

As the Supreme Court observed in *Link v. Wabash R.R. Co.*:

> There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

370 U.S. 626, 633-34 (1962). Thus, "absent a truly extraordinary situation, the client is not excused from the consequences of his attorney's nonfeasance." *Chira*, 634 F.2d at 666 (affirming a dismissal with prejudice under Rule 41(b)) (internal citations omitted); *see also Lastra v. Weil, Gotshal & Manges LLP*, No. 03 Civ. 8756 (RJH)(RLE), 2005 WL 551996, at *4 (S.D.N.Y. March 8, 2005) ("Claims by a litigant that he should be excused from his attorney's actions because of alleged fraudulent conduct and disobeyance of the litigant's orders may give rise to a claim for malpractice, but does not constitute an extraordinary circumstance or excusable neglect.").

Here, Ms. Stuart was certainly aware of her attorney's repeated non-compliance with the Court's orders and of the delays attributable solely to Ms. Pollack. Ms. Stuart initially received notice on May 15,[32] that her attorney's conduct may result in dismissal. (*See* May 15 Tr. at 42: 16-23 - 43:2-24 (warning Ms. Stuart that "[t]here are cases out there that suggest that when parties do not comply with the Court's orders and do not proceed with the prosecution of their lawsuit, that under appropriate circumstances, the Court can dismiss that lawsuit for failure to prosecute that case. . . . [T]here are also [S]upreme [C]ourt cases that say that parties are responsible for the[ir] attorneys. And if the attorney is not prepared to go forward, there are cases that suggest that the party can bear responsibility for that in terms of a dismissal of the action.").

Furthermore, as noted *supra*, the Court also advised plaintiff on several of the days that Ms. Stuart chose to attend the trial that Ms. Pollack's conduct, if continued, would result in dismissal with prejudice, as in the following exchange that occurred on May 29:

> MS. POLLACK: I can't proceed without the evidence I'm entitled to.
>
> THE COURT: Ms. Stuart, your lawyer is refusing to proceed with the case. She disagrees with my ruling [regarding the Fellner documents]. . . . It is not proper to refuse to proceed with a trial. If you do that, if you decide to not proceed with the trial, I'm left with no alternative but to dismiss the case as I said when she's

---

[32] The May 15 trial date was adjourned, as discussed *supra*, due to Ms. Pollack's lack of preparedness.

previously done this and [that] continues to be my position and that's what I'm going to do.

(*Id.* at 928:17-25 - 929:1-5.)

Moreover, also as noted *supra*, on one of the days that Ms. Stuart chose not to attend the trial – June 4 – the Court initiated a telephone conference with Ms. Stuart, wherein she received detailed notice of her attorney's particularly egregious misconduct that day and of the consequences that would result if her attorney continued to engage in such behavior. Specifically, as noted *supra*, the Court advised Ms. Stuart:

> Ms. Pollack has again several times this morning failed to obey the court's rulings and orders regarding what matters she should or should not bring before the jury's attention . . . , even though I had explicitly, as you were here on Friday heard me tell her, ordered her not to do that. . . . [Y]our lawyer advised me again, as she has done in your presence, that if I'm not going to allow her to go into these areas, then she is unable to proceed with the case. And it is my view that given her actions . . . that this action should be dismissed with prejudice. But I wanted you to be advised of that and I wanted to give you an opportunity to be heard to make sure you understood what your lawyer's position is.

(1632:7-25 - 1633:1-6.) Subsequently, the following exchange took place between the Court and Ms. Stuart:

> THE COURT: [A]s I have told you previously . . . , my intent from day

one was to proceed with this case. . . . But your counsel, if she continues, as she has been, to disobey my orders, I'm left with no choice. I cannot proceed with a trial where your attorney is ignoring my orders.

> ***

> THE COURT: Do you understand Ms. Stuart?

> MS. STUART: Yes. I am instructing my attorney to follow your orders.

(*Id.* at 1636:2-18; *see also supra* Section I.B.5.)[33] It is clear that such statements put both Ms. Pollack and Ms. Stuart on notice of the consequences of Ms. Pollack's continued failure to comply with the Court's orders.[34]

---

[33] As noted *supra*, although Ms. Stuart urged her attorney, during the telephone conference on June 4, to comply with the Court's orders, she nevertheless chose not to attend trial the following day, and, thus, did not have the opportunity to ensure that her attorney complied with that direction, or, at least, to monitor her attorney's conduct.

[34] The Court of Appeals of the District of Columbia mandates that sufficient notice in this situation – when a court seeks "to notify the client [that] attorney misconduct has occurred to a degree that the court is contemplating dismissal if a recurrence occurs" – should be provided as follows:

> [The] communication should notify the client, in clear and unequivocal terms, that his case is in danger of dismissal due to his lawyer's dereliction; that the court will no longer tolerate the attorney's current course of conduct; and that the client is advised to be in touch with his lawyer to ensure future compliance with

Therefore, Ms. Stuart cannot now be excused from the consequences of her freely chosen representative's misconduct. *See, e.g., Chira*, 634 F.2d at 666-67; *Easley v. Kirmsee*, 382 F.3d 693, 698 (7th Cir. 2004) ("[The plaintiff] is asking us to bail her out and excuse her counsel's neglect of the case and contemptuous conduct in an attempt to shift the blame for her attorney's inattentiveness to the district court, and this we refuse to do."); *Tango Music, LLC v. DeadQuick Music, Inc.*, 348 F.3d 244, 247 (7th Cir. 2003) ("If a party's lawyer is guilty of professional malpractice . . . , the party has a remedy against him, but it should not be permitted to shift the burden of its agent's neglect to the district court and the defendants.") (citations omitted); *Shea*, 795 F.2d at 1078 ("Our reluctance to penalize an innocent client only applies, of course, where the client is in fact innocent, i.e., he is unaware of his attorney's dereliction and not negligent in his own right in not reasonably keeping in contact with the

_____

court orders, or to make arrangements for new counsel. If after this notification the attorney persists in the errant conduct, then the client shares in the responsibility for that conduct, and dismissal will generally be upheld.

*Shea v. Donohoe Const. Co., Inc.*, 795 F.2d 1071, 1078 (D.C. Cir. 1986). In this Circuit, "district judges" are "encourage[d]," although not required, "to give notice directly to the client where there is reason to suspect that attorney incompetence is about to sink a client's case, so that the litigant may attempt to remedy the situation." *Dodson v. Runyon*, 86 F.3d 37, 40 n.4 (2d Cir. 1996). Here, the Court notes that the notice provided to Ms. Stuart, described *supra*, satisfied all of the *Shea* requirements; of course, following such notice, Ms. Pollack "persist[ed] in the errant conduct." *Shea*, 795 F.2d at 1078.

attorney in his case. When the client is aware, or should be aware, of his attorney's misconduct, it is not unjust to penalize him."); *Ford v. Fogarty Van Lines, Inc.*, 780 F.2d 1582, 1583 (11th Cir. 1986) ("A party should not be punished for his attorney's mistake *absent a clear record of delay or willful contempt and a finding that lesser sanctions would not suffice*.") (emphasis added); *Callip v. Harris County Child Welfare Dept.*, 757 F.2d 1513, 1522 (5th Cir. 1985) ("We believe that there comes a point at which the deficiency in counsel's performance puts the plaintiff on notice that, unless a new lawyer is obtained, the very continuation of the lawsuit is threatened. Given the clear record of delay in this case, we conclude that counsel's performance reached that point."); *see also Baker v. Latham Sparrow Bush Assoc.*, 72 F.3d 246, 252 (2d Cir. 1995) ("[T]his is not a case of an unwitting litigant being made to suffer for the sins of her attorney. . . . There comes a time when litigants' efforts to sidestep adverse rulings [denying untimely amendments of a complaint in a civil rights case] must cease.").

## C. Prejudice to the Defendant

For the purposes of Rule 41(b), "[p]rejudice may be presumed as a matter of law in certain cases, but the issue turns on the degree to which the delay was lengthy and inexcusable." *Lyell Theatre Corp. v. Loews Corp.*, 682 F.2d 37, 43 (2d Cir. 1982); *see Shannon v. GE*, 186 F.3d 186, 195 (2d Cir. 1999) ("[P]rejudice to defendants resulting from unreasonable delay may be presumed."). In cases where "delay is more moderate or excusable, the need to show actual prejudice is proportionally greater." *Drake*, 375 F.3d at 256.

Here, the Court finds that the delays attributable to Ms. Pollack, both prior to and during the trial, were sufficiently lengthy and inexcusable so as to presume, as a matter of law, that further delay would have prejudiced defendant. Indeed, defendant incurred substantial costs in preparing for a trial to begin on May 15. In addition, following the commencement of the trial on May 22, the delays caused by Ms. Pollack's non-compliance with the Court's orders – including extended reargument of the Court's rulings, tardiness, and frequent refusals to proceed – required defendant to expend an inordinate amount of time and money in litigating this action, and prejudiced their ability to prepare for trial in this case.

Furthermore, Ms. Pollack's continued non-compliance with the Court's orders would have certainly prejudiced defendant due to Ms. Pollack's repeated and egregious attempts to present improper argument and testimony to the jury, and the likelihood that such attempts would continue if this trial were to go forward.[35] As set forth above, Ms. Pollack has frequently, in violation of this Court's orders, discussed and asked questions regarding evidence that had been specifically excluded by the Court while in the presence of the jury. That is, with increasing frequency as the trial progressed, Ms. Pollack has posed questions regarding matters such as the Gangemi evidence, the Fellner documents, and the non-prosecution of Ragusa. Moreover, through her questioning of witnesses and argument in open court, Ms. Pollack has made grossly inflammatory comments regarding defendant and defense counsel while in the presence of the jury; specifically, Ms. Pollack has stated, among other things, that defendant was involved in a "cover-up" of wrongdoing in this action, and that defense counsel has withheld discovery materials from plaintiff and otherwise obstructed justice. There is absolutely no reason to believe that, had the trial continued, Ms. Pollack would have stopped presenting such improper, irrelevant, inflammatory and unsubstantiated matters to the jury, in direct violation of the Court's rulings. Accordingly, the Court finds that, as of June 5, the relentless and egregious misconduct of plaintiff's counsel had significantly prejudiced defendant, and that the prejudice was so severe that it had undermined, beyond the point of repair by any instruction or lesser sanction, the integrity of the trial and any verdict that would result therefrom. Therefore, if the trial continued, the prejudice suffered by defendant was going to infect the remainder of the trial; furthermore, if the Court were forced to declare a mistrial because of Ms. Pollack's misconduct, requiring defendant to participate in another trial would have resulted in substantial prejudice to defendant.

---

[35] The Court notes that it repeatedly warned Ms. Pollack to keep her voice down while speaking at sidebar, as it was concerned that her comments at sidebar – including frequent assertions that defense counsel and the Court were working in concert to harm plaintiff's case (*see, e.g., id.* at 782:1-3 (asking the Court at sidebar, "Why are you protecting the government?") – could be heard by the jury. (*See id.* at 682:13-15 (THE COURT: "I was concerned, given the level of your voice and what you were doing [at sidebar], that the jury was hearing what was going on."); 1830:8-12 (indicating that, at a sidebar, Ms. Pollack "challenged [the Court's] ruling in a very loud voice" and accused the Court of "representing" defendant).

D. The Court's Interest in Managing its
   Docket Versus Plaintiff's Interest in
   Receiving an Opportunity to Be Heard

"There must be compelling evidence of an extreme effect on court congestion before a litigant's right to be heard is subrogated to the convenience of the court." *Lucas*, 84 F.3d at 535-36. Here, the Court has carefully balanced its own interest in managing its docket versus the plaintiff's interest in receiving an opportunity to be heard. As set forth below, the Court finds that its interest in managing its docket substantially outweighs plaintiff's interest in receiving a further opportunity to be heard in this case, and, thus, favors dismissal of this action. Ms. Pollack's misconduct has significantly limited the Court's ability to proceed with this case in an orderly and fair manner, and to provide other litigants in other cases with an opportunity to be heard in this Court. By contrast, plaintiff had been given an extensive opportunity to present her claims to the jury, and has received ample notice that her opportunity to be heard would be cut short if her attorney's conduct did not improve.

First, the Court's ability to manage its docket has been significantly impaired by the delays, discussed *supra*, arising from Ms. Pollack's conduct, as several trial dates in other cases before this Court have been adjourned for extended periods of time. Furthermore, Ms. Pollack's often frivolous accusations of misconduct and her reargument of the Court's rulings, as well as her inflammatory comments made within the presence of the jury, have required this Court to devote an inordinate amount of time and effort to this case in order to ensure that defendant and Ms. Stuart receive a fair trial. *See Chira*, 634 F.2d at 668 (2d Cir. 1980) ("[F]airness to other litigations, whether in the same case or merely in the same court (as competitors for scarce judicial resources), requires us to affirm and endorse the district court's action here. Burgeoning filings and crowded calendars have shorn courts of the luxury of tolerating procrastination.").

Second, as to plaintiff's interest in receiving an opportunity to be heard, it is indisputable that plaintiff has received an ample opportunity to be heard in this action. The record clearly demonstrates that the Court granted plaintiff every opportunity to present her claims to a jury, notwithstanding the frequent nonfeasance and misconduct of her attorney (that is, until Ms. Pollack's misconduct made it impossible for this trial to proceed in an orderly and fair manner). At the time of dismissal of this action on June 5, plaintiff had already presented eleven witnesses over the course of eight and one-half days of trial, and had yet to rest her case.[36] Furthermore, prior to dismissal, the Court had sought to protect plaintiff's interest in being heard by, among other things, granting plaintiff's request for an adjournment *on the day that trial was scheduled to begin*, according plaintiff's counsel wide latitude in scheduling matters and in her questioning of witnesses, and reserving judgment as to defendant's motion to dismiss, notwithstanding Ms. Pollack's conduct and the recurring delays arising therefrom.

---

[36] Although plaintiff certainly had an opportunity to present a substantial portion, if not all, of the relevant facts and allegations pertaining to her Title VII claim, the Court must point out that much of those eight and one-half days of testimony were devoted, due to Ms. Pollack's misguided litigation strategy in this action, to collateral issues unrelated to Ms. Stuart's sole legal claim.

## E. The Efficacy of Lesser Sanctions

Under Rule 41(b), "dismissal is a remedy that a district judge should generally impose 'only when he is sure of the impotence of lesser sanctions.'" *Dodson*, 86 F.3d at 42 (quoting *Chira*, 634 F.2d at 665). In addition, while "*absent prejudice*, dismissal for failure to prosecute is inappropriate where the fault clearly lay in the lawyer's failure to attend to his client's business, . . . where opposing parties are found to have been meaningfully prejudiced by a plaintiff's delay, this factor speaks strongly in favor of dismissal, and may well override the hardship to plaintiff" resulting from a dismissal based on her attorney's conduct. *Dodson*, 86 F.3d at 40 (emphasis added).

Here, the fact that the Court's numerous attempts during the course of the trial to put an end to Ms. Pollack's misconduct have failed demonstrates that no lesser sanction than dismissal would be effective in this case. Specifically, during the trial, the Court repeatedly informed Ms. Pollack that it considered her conduct to be "sanctionable" and, in once instance, "contemptuous," and that it was going to fully address such conduct and the potential consequences thereof, at the conclusion of the trial. (*See, e.g.,* Tr. at 1029:19-20; 1297-1299; 1402:1-10.) In addition, as noted *supra*, the Court repeatedly informed Ms. Stuart that her attorney's conduct was unacceptable and that, if it did not improve, this case would be dismissed. As a result, in one instance, Ms. Stuart directed her attorney, in open court, to comply with this Court's orders.

Nevertheless, despite (1) the Court's statements that it considered her conduct sanctionable, and that it would fully consider such conduct, and whether monetary sanctions should be imposed on Ms. Pollack, at the conclusion of trial, (2) the Court's repeated warnings to Ms. Pollack and to Ms. Stuart regarding the potential consequences of Ms. Pollack's misconduct, and (3) Ms. Stuart's own instruction to her attorney urging her to comply with the Court's orders, the instances of Ms. Pollack's misconduct only became more frequent and more egregious as the trial progressed.

Furthermore, the Court found *supra*, in Section II.C, that Ms. Pollack's conduct has prejudiced defendants through the presentation of inadmissible and/or highly inflammatory matters to the jury, and through her unjustified delays in the prosecution of this case. The Court further finds that such prejudice is "meaningful" and overrides any hardship to plaintiff that may result from dismissal of this action on the basis of her attorney's misconduct. *Dodson*, 86 F.3d at 41. In addition, the Court finds that, aside from the prejudice to defendant, Ms. Pollack's conduct has "put an intolerable burden on [this Court] by requiring the [C]ourt to modify its own docket and operations in order to accommodate the delay[s attributable solely to Ms. Pollack]." *See Time Warner Cable of N.Y.C., a Div. of Time Warner Entert. Co. L.P. v. Caro*, No. 98 Civ. 3354 (FB), 1999 WL 221649, at *2 (E.D.N.Y. April 9, 1999) (quoting *Shea*, 795 F.2d at 1075); *see Shea*, 795 F2d at 1075-76 ("[A]ttorney misconduct that does not give rise to actual prejudice to the other party . . . may still put an intolerable burden on a district court by requiring the court to modify its own docket and operations in order to accommodate the delay. Where the delay or misconduct would require the court to expend considerable judicial resources in the future in addition to those it has already wasted, . . . dismissal may be an appropriate exercise of discretion.").

Accordingly, given the egregious misconduct of plaintiff's counsel and the deleterious effects on defendant and the Court arising therefrom, and the fact that Ms. Pollack was unresponsive to every attempt by this Court to remedy her behavior, the Court finds that no lesser sanction than dismissal would be effective in this case.[37]  *See, e.g.,*

*Peart*, 992 F.2d at 462-63 (affirming dismissal under Rule 41(b) where "the court did consider lesser sanctions but concluded that they were not justified in view of [counsel for plaintiff's] particularly contemptuous and disrespectful behavior"); *Chira*, 634 F.2d at 666 (rejecting plaintiff's contention that dismissal under Rule 41(b) was "too harsh a remedy" in light of the plaintiff's "complete intransigence in the face of a clear court order"); *Barney v. Consol. Ed. Co. of N.Y.*, No. 99 Civ. 0823 (DGT)(SMG), 2006 WL 4401019, at *13-*14 (E.D.N.Y. July 19, 2006) (declining to impose lesser sanctions than dismissal where "plaintiff has repeatedly failed to comply despite warnings that lesser sanctions would be imposed" and "no sanction short of dismissal would sufficiently redress the prejudice suffered by defendant"); *see also Freeland v. Amigo*, 103 F.3d 1271, 1280 (6th Cir. 1997) (holding that "*in the absence of contumacious conduct*, an alternate sanction that would protect the integrity of pretrial procedures should be utilized rather than dismissal") (emphasis added); *Knoll v. Amer. Tel & Tel. Co.*, 176 F.3d 359, 366 (6th Cir. 1999) ("Consideration of lesser sanctions would seem particularly superfluous under circumstances like those before us, where

---

[37] The Court notes that, in several other actions filed in this district, Ms. Pollack has been extensively criticized and, at times, sanctioned by courts for her errant conduct in violation of courts' orders.  *See Macaluso v. Keyspan Energy*, No. 05 Civ. 0823 (ADS)(WDW) , 2007 U.S. Dist. LEXIS 24778, at *65 (E.D.N.Y. April 3, 2007) (recommending the imposition of sanctions against Ms. Pollack based on her "failure to obey orders and to meet deadlines," and recommending denial of Ms. Pollack's motion for recusal of the magistrate judge)("Ms. Pollack apparently believes that when a court does not automatically condone her every action or inaction, the reason must be bias instead of the natural result of the way in which she chooses to litigate."), *adopted by* 2007 U.S. Dist. LEXIS 33464, at *16 (May 7, 2007)("Throughout the case, [Ms. Pollack] has continually failed to respond to discovery requests and motions."); *Burgie v. Euro Brokers, Inc.*, No. 05 Civ. 0968 (CPS)(KAM), 2006 WL 845400, at *13-*15 (E.D.N.Y. March 30, 2006)(imposing sanctions against Ms. Pollack due to her failure to comply with the court's orders, noting that Ms. Pollack failed to demonstrate a medical excuse for her noncompliance where she refused to supply medical documentation to the court, and stating that "the record is replete with numerous instances of continued non-compliance with the Court's orders by plaintiff and her counsel."); *Mugno v. Societe Internationale De Telecommunications Aeronautiques, Ltd.*, No. 05 Civ. 2037 (DRH)(ARL), 2007 WL 316573 , at *15 (E.D.N.Y. Jan. 30, 2007) (raising "a cautionary flag as to Plaintiff's Counsel's performance," and noting that, while "there are many pressures to being a solo practitioner," those pressures, and other concerns raised by Ms. Pollack, "do not

vitiate her ethical obligation to diligently represent her client"); *see also In re Pollack*, 706 N.Y.S.2d 120, (N.Y. App. Div. 2000) (censuring Ms. Pollack for her "professional misconduct" arising from, *inter alia*, her failures to comply with an order of the Supreme Court of the State of New York, Nassau County).  In addressing the instant matter, the Court, of course, has not considered the instances of misconduct by Ms. Pollack recited in these other cases; however, the Court notes that, as is evident from the record in this case, it appears that the sanctions and criticisms levied against Ms. Pollack by other courts have not made Ms. Pollack more amenable to complying with a court's directions.

counsel inexcusably has failed to prepare and then refused to proceed at the time scheduled for trial. Although this court often seeks to sanction counsel rather than client for counsel's delinquent pretrial behavior, in the face of contumacious conduct we must return to the principle enunciated by the Supreme Court in *Link*, 370 U.S. at 633-34, that a party ultimately assumes responsibility for the actions of its freely selected agent."); *MacPherson v. Yale Med. Grp.*, No. 3-02 Civ. 1973 (JFH), 2006 WL 2715242, at *4 (D. Conn. Sept. 21, 2006) ("While the court could impose a lesser sanction, it is the judgment of this court that a lesser sanction would not be effective. Despite two Orders (one verbal, one written), plaintiff still has failed to comply. The court does not know what more it can effectively do.").

F. Balancing of the Rule 41(b) Factors

The Court finds that each of the above factors favors dismissal of this action pursuant to Rule 41(b). That is, the Court finds that Ms. Pollack's misconduct extended throughout the duration of the pre-trial phase and the trial proceedings in this action; plaintiff had specific and repeated notice that such conduct would result in dismissal; Ms. Pollack's conduct – particularly, the discussion of inadmissible evidence and other prejudicial matters before the jury – had severely prejudiced defendant during the trial, and, if the trial were to continue, such conduct would almost certainly have persisted and, thus, resulted in further prejudice to defendant; the Court's interest in managing its docket substantially outweighed plaintiff's interest in receiving a further opportunity to be heard; and the Court repeatedly warned Ms. Pollack that it considered her actions contemptuous and sanctionable, and that it would fully address such conduct at the

conclusion of the trial, only to find that such warnings did nothing to abate the severity or the frequency of Ms. Pollack's misconduct, and the prejudice to defendant arising therefrom.

Furthermore, the Court notes that it has accorded greater weight to the prejudice factor than to the docket management factor in determining that the severe sanction of dismissal is warranted in this case. That is, although Ms. Pollack's dilatory conduct substantially impaired this Court's ability to manage its docket, the Court was nevertheless willing to tolerate the increased burden on its docket and, thus, sought to proceed with the trial in this action. (*See, e.g.,* Tr. at 1639:16-17 (THE COURT: "I've told you that it [is] my intent to again try to proceed with this case.").) However, the cumulative prejudicial effect of eight days of Ms. Pollack's severe misconduct – much of which occurred in the presence of the jury – warranted dismissal in this action notwithstanding this Court's willingness to tolerate the severe delays arising from Ms. Pollack's misconduct. When faced with such a persistent and disturbing pattern of misconduct that has prejudiced defendant, and is almost certain to continue to do so, the Court must heed its duty both to ensure the fairness of the trial proceeding and to avoid condoning a "pattern of behavior by [Ms. Pollack] that was shocking, unbecoming [an] officer[] of the court and lacking in concern for professional integrity and responsibility." *Van Iderstine Co. v. RGJ Contracting Co., Inc.*, 480 F.2d 454, 455 (2d Cir. 1973). As the Second Circuit has observed:

We do not believe any civilized legal system need tolerate behavior which makes a mockery of our adversary trial system. Civil litigation provides an opportunity for private parties to dispose of disputes in an orderly and disciplined fashion. But the open forum which our courts provide for conflict resolution is not, nor can it ever be, a license to slander and abuse one's adversary. Such conduct diminishes the integrity of an institution whose usefulness depends upon the respect in which it is held by the public, and by the lawyers who practice in it. . . . Lawyers, as officers of the court, must always be alert to the rule that zealous advocacy [on] behalf of a client can never excuse contumacious or disrespectful conduct.

*Id.* at 459. Here, the Court finds that the pattern of behavior exhibited by Ms. Pollack – flouting the Court's rulings so as to prejudice defendant and repeatedly impugning the integrity of defense counsel and the Court – is the type of conduct that serves to distort the fairness of a trial proceeding, to demean the integrity of the judicial system and to diminish the public's respect for the legal profession. *See, e.g., id.*; *Matter of Palmisano*, 70 F.3d 483, 488 (7th Cir. 1995) ("Federal courts are no more willing to tolerate repeated, false, malicious accusations of judicial dishonesty than are state courts."); *U.S. Dist. Court for the E. Dist. of Wash. v. Sandlin*, 12 F.3d 861, 866 (9th Cir. 1993) ("[O]nce a lawyer is admitted to the bar, although he does not surrender his freedom of expression, he must temper his criticisms in accordance with professional standards of conduct."); *United States v. Dowdy*, 960 F.2d 78, 81 (8th Cir. 1992) ("While zealous advocacy is essential to the conscientious, vigorous representation of a client's interests . . . the vigor permissible in representing a client's interests has never included the flouting of a judge's ruling.") (citation omitted); *Conklin v. Warrington Tp.*, No. 05 Civ. 1707 (CCC), 2006 WL 2246415, at *2 (M.D. Pa. Aug. 4, 2006) ("When an attorney is of the opinion that the court has issued an erroneous ruling, it is his or her duty as an advocate to seek reconsideration or clarification of that ruling. However, the exercise of this duty of advocacy never justifies the use of disrespectful, unprofessional or indecorous language to the court. Respect and zealous advocacy are not mutually exclusive concepts."). Thus, where, as here, a party engages in grossly contumacious conduct in violation of numerous court orders resulting in prejudice to a defendant, it is within the court's discretion to strongly rebuke that party for its conduct both to restore order to the instant proceeding and as a deterrent to others who may appear before this Court. *See, e.g., Nat'l Hockey League v. Metrop. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) ("[H]ere, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."); *Chira*, 634 F.2d at 668 ("Delays have dangerous ends and unless district judges use the clear power to impose the ultimate sanction when appropriate, exhortations of diligence are impotent."); *Shea v. Donohoe Const. Co.*, 795 F.2d 1071, 1077 (D.C. Cir. 1986) (finding that a district court may dismiss a case to "sanction conduct that is disrespectful to the court and to deter similar misconduct in the

future" even absent a showing of prejudice to the other party); *Lediju v. New York City Dep't of Sanitation*, 173 F.R.D. 105 (S.D.N.Y.1997) ("'If parties could ignore Court Orders with the liberty in which [plaintiff] has acted, the civil justice system would suffer, and judges would have no reason to invest their energy in case management. In effect, parties and the Court would be at the mercy of the least diligent, the most irresponsible, or any obstreperous litigator. There would be no premium placed on adherence to a schedule or a Court Order, and no incentive to manage the litigation to reduce its cost and bring justice as expeditiously as possible to each of the parties.'") (quoting *Martin v. Mftrs. Hanover Trust*, No. 94 Civ. 6183 (DLC), 1996 WL 603937 at *6 (S.D.N.Y. Oct. 22, 1996)). Accordingly, the Court finds that all of the above factors – especially, the prejudice factor – favor dismissal of this action with prejudice under Rule 41(b) based on the misconduct of plaintiff's attorney.

III. CONCLUSION

For the reasons stated above, defendant's motion to dismiss is GRANTED pursuant to Rule 41(b). Plaintiff's case is DISMISSED with prejudice. The Clerk of the Court shall close this case and enter judgment accordingly.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 13, 2007
Central Islip, New York

* * *

The attorney for plaintiff is Ruth M. Pollack, Esq., Law Office of Ruth M. Pollack, P.O. Box 120, 1288 West Main Street, Riverhead, New York 11901. The attorney for defendant is Roslynn R. Mauskopf, Esq., United States Attorney for the Eastern District of New York, by Diane C. Leonardo Beckmann, Esq., Thomas McFarland, Esq., and Denise McGinn, Esq., Assistant United States Attorneys, United States Attorney's Office, 610 Federal Plaza, Central Islip, New York 11722.